MEEK ᴇᴛ ᴀʟ. *v.* PITTENGER, SECRETARY OF
EDUCATION, ᴇᴛ ᴀʟ.

No. 73–1765.  Argued February 19, 1975—Decided May 19, 1975

350

STEWART, J., announced the judgment of the Court and delivered an opinion of the Court, in which BLACKMUN and POWELL, JJ., joined, and in all but Part III of which DOUGLAS, BRENNAN, and MARSHALL, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which DOUGLAS and MARSHALL, JJ., joined, *post,* p. 373. BURGER, C. J., filed an opinion concurring in the judgment in part and dissenting in part, *post,* p. 385. REHNQUIST, J., filed an opinion concurring in the judgment in part and dissenting in part, in which WHITE, J., joined, *post,* p. 387.

*Leo Pfeffer* and *William P. Thorn* argued the cause and filed briefs for appellants.

*J. Justin Blewitt, Jr.,* Deputy Attorney General of Pennsylvania, argued the cause for appellees Pittenger et al. With him on the brief was *Israel Packel,* Attorney General. *William Bentley Ball* argued the cause for appellees Diaz et al. With him on the brief were *Joseph G. Skelly, James E. Gallagher, Jr., C. Clark Hodgson, Jr.,* and *William D. Valente. Henry T. Reath* argued the cause and filed a brief for appellees Chesik et al.*

MR. JUSTICE STEWART announced the judgment of the Court and delivered the opinion of the Court (Parts I, II, IV, and V), together with an opinion (Part III), in which MR. JUSTICE BLACKMUN and MR. JUSTICE POWELL, joined.

This case requires us to determine once again whether a state law providing assistance to nonpublic, church-related, elementary and secondary schools is constitutional under the Establishment Clause of the First Amendment, made applicable to the States by the Fourteenth Amendment. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 108; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303.

I

With the stated purpose of assuring that every school-child in the Commonwealth will equitably share in the benefits of auxiliary services, textbooks, and instructional

---

*\*Theodore R. Mann, Paul S. Berger, Arnold Forster, Samuel Rabinove, Henry N. Rapaport, David Rubin,* and *Joseph B. Robison* filed a brief for the American Association of School Administrators et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Stuart D. Hubbell* for the Council for American Private Education, and by *Howard Gould* for the National Audio-Visual Association, Inc.

material provided free of charge to children attending public schools,[1] the Pennsylvania General Assembly in 1972 added Acts 194 and 195, July 12, 1972, Pa. Stat. Ann., Tit. 24, § 9–972, to the Pennsylvania Public School Code of 1949, Pa. Stat. Ann., Tit. 24, §§ 1–101 to 27–2702.

Act 194 authorizes the Commonwealth to provide "auxiliary services" to all children enrolled in nonpublic elementary and secondary schools meeting Pennsylvania's compulsory-attendance requirements.[2] "Auxiliary serv-

---

[1] See Act 194, § 1 (a), Pa. Stat. Ann., Tit. 24, § 9–972 (a); Act 195, § 1 (a), Pa. Stat. Ann., Tit. 24, § 9–972 (a).

[2] Act 194 provides:

"(a) Legislative Finding; Declaration of Policy. The welfare of the Commonwealth requires that the present and future generations of school age children be assured ample opportunity to develop to the fullest their intellectual capacities. To further this objective, the Commonwealth provides, through tax funds of the Commonwealth, auxiliary services free of charge to children attending public schools within the Commonwealth. Approximately one quarter of all children in the Commonwealth, in compliance with the compulsory attendance provisions of this act, attend nonpublic schools. Although their parents are taxpayers of the Commonwealth, these children do not receive auxiliary services from the Commonwealth. It is the intent of the General Assembly by this enactment to assure the providing of such auxiliary services in such a manner that every school child in the Commonwealth will equitably share in the benefits thereof.

"(b) Definitions. The following terms, whenever used or referred to in this section, shall have the following meanings, except in those circumstances where the context clearly indicates otherwise:

" 'Nonpublic school' means any school, other than a public school within the Commonwealth of Pennsylvania, wherein a resident of the Commonwealth may legally fulfill the compulsory school attendance requirements of this act and which meet the requirements of Title VI of the Civil Rights Act of 1964 (Public Law 88–352).

" 'Auxiliary services' means guidance, counseling and testing services; psychological services; services for exceptional children; remedial and therapeutic services; speech and hearing services; services for the improvement of the educationally disadvantaged (such as,

ices" include counseling, testing, and psychological services, speech and hearing therapy, teaching and related services for exceptional children, for remedial students, and for the educationally disadvantaged, "and such other secular, neutral, non-ideological services as are of benefit to nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth." Act 194 specifies that the teaching and services are to be provided in the nonpublic schools themselves by personnel drawn from the appropriate "intermediate unit," part of the public school system of the Commonwealth established to provide special services to local school districts. See Pa. Stat. Ann., Tit. 24, §§ 9–951 to 9–971.

Act 195 authorizes the State Secretary of Education, either directly or through the intermediate units, to lend textbooks without charge to children attending nonpublic elementary and secondary schools that meet the Common-

---

but not limited to, teaching English as a second language), and such other secular, neutral, non-ideological services as are of benefit to nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth.

"(c) Provision of Services. Pursuant to rules and regulations established by the secretary, each intermediate unit shall provide auxiliary services to all children who are enrolled in grades kindergarten through twelve in nonpublic schools wherein the requirements of the compulsory attendance provisions of this act may be met and which are located within the area served by the intermediate unit, such auxiliary services to be provided in their respective schools. The secretary shall each year apportion to each intermediate unit an amount equal to the cost of providing such services but in no case shall the amount apportioned be in excess of thirty dollars ($30) per pupil enrolled in nonpublic schools within the area served by the intermediate unit."

The Pennsylvania Public School Code of 1949 provides that the requirements of the compulsory-attendance law may be met at a nonpublic school so long as "the subjects and activities prescribed by the standards of the State Board of Education are taught in the English language." Pa. Stat. Ann., Tit. 24, § 13–1327.

wealth's compulsory-attendance requirements.[3] The books that may be lent are limited to those "which are acceptable for use in any public, elementary, or secondary school of the Commonwealth."

Act 195 also authorizes the Secretary of Education, pursuant to requests from the appropriate nonpublic school officials, to lend directly to the nonpublic schools "instructional materials and equipment, useful to the education" of nonpublic school children.[4] "Instructional

---

[3] The sections of Act 195 relating to the loan of textbooks provide:
"(b) Definitions. . . . 'Textbooks' means books, reusable workbooks, or manuals, whether bound or in looseleaf form, intended for use as a principal source of study material for a given class or group of students, a copy of which is expected to be available for the individual use of each pupil in such class or group. Such textbooks shall be textbooks which are acceptable for use in any public, elementary, or secondary school of the Commonwealth.

"(c) Loan of Textbooks. The Secretary of Education directly, or through the intermediate units, shall have the power and duty to purchase textbooks and, upon individual request, to loan them to all children residing in the Commonwealth who are enrolled in grades kindergarten through twelve of a nonpublic school wherein the requirements of the compulsory attendance provisions of this act may be met. Such textbooks shall be loaned free to such children subject to such rules and regulations as may be prescribed by the Secretary of Education.

"(d) Purchase of Books. The secretary shall not be required to purchase or otherwise acquire textbooks, pursuant to this section, the total cost of which, in any school year, shall exceed an amount equal to ten dollars ($10) multiplied by the number of children residing in the Commonwealth who on the first day of October of such school year are enrolled in grades kindergarten through twelve of a nonpublic school within the Commonwealth in which the requirements of the compulsory attendance provisions of this act may be met."

[4] The sections of Act 195 relating to the direct loan of instructional material and equipment provide:
"(b) Definitions. . . . 'Instructional equipment' means instructional equipment, other than fixtures annexed to and forming part of the real estate, which is suitable for and to be used by children and/or

materials" are defined to include periodicals, photographs, maps, charts, sound recordings, films, "or any other printed and published materials of a similar nature." "Instructional equipment," as defined by the Act, includes projection equipment, recording equipment, and laboratory equipment.

On February 7, 1973, three individuals and four organizations[5] filed a complaint in the District Court for the

teachers. The term includes but is not limited to projection equipment, recording equipment, laboratory equipment, and any other educational secular, neutral, non-ideological equipment as may be of benefit to the instruction of nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth.

" 'Instructional materials' means books, periodicals, documents, pamphlets, photographs, reproductions, pictorial or graphic works, musical scores, maps, charts, globes, sound recordings, including but not limited to those on discs and tapes, processed slides, transparencies, films, filmstrips, kinescopes, and video tapes, or any other printed and published materials of a similar nature made by any method now developed or hereafter to be developed. The term includes such other secular, neutral, non-ideological materials as are of benefit to the instruction of nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth.

. . . . .

"(e) Purchase of Instructional Materials and Equipment. Pursuant to requests from the appropriate nonpublic school official on behalf of nonpublic school pupils, the Secretary of Education shall have the power and duty to purchase directly, or through the intermediate units, or otherwise acquire, and to loan to such nonpublic schools, instructional materials and equipment, useful to the education of such children, the total cost of which, in any school year, shall be an amount equal to but not more than twenty-five dollars ($25) multiplied by the number of children residing in the Commonwealth who on the first day of October of such school year, are enrolled in grades kindergarten through twelve of a nonpublic school in which the requirements of the compulsory attendance provisions of this act may be met."

[5] The individual plaintiffs are Sylvia Meek, Bertha G. Myers, and Charles A. Weatherley; all are resident taxpayers of the Common-

Eastern District of Pennsylvania challenging the constitutionality of Acts 194 and 195, and requesting an injunction prohibiting the expenditure of any funds under either statute. The complaint alleged that each Act "is a law respecting an establishment of religion in violation of the First Amendment" because each Act "authorizes and directs payments to or use of books, materials and equipment in schools which (1) are controlled by churches or religious organizations, (2) have as their purpose the teaching, propagation and promotion of a particular religious faith, (3) conduct their operations, curriculums and programs to fulfill that purpose, (4) impose religious restrictions on admissions, (5) require attendance at instruction in theology and religious doctrine, (6) require attendance at or participation in religious worship, (7) are an integral part of the religious mission of the sponsoring church, (8) have as a substantial or dominant purpose the inculcation of religious values, (9) impose religious restrictions on faculty appointments, and (10) impose religious restrictions on what the faculty may teach." The Secretary of Education and the Treasurer of the Commonwealth were named as the defendants.[5]

---

wealth of Pennsylvania. The organizational plaintiffs are the American Civil Liberties Union, the National Association for the Advancement of Colored People, the Pennsylvania Jewish Community Relations Council, and Americans United for Separation of Church and State; each group has members who are taxpayers of Pennsylvania. 374 F. Supp. 639, 643. The District Court properly concluded that both the individual and the organizational plaintiffs had standing to bring this challenge to Acts 194 and 195. 374 F. Supp., at 647; see *Flast* v. *Cohen,* 392 U. S. 83; *Sierra Club* v. *Morton,* 405 U. S. 727.

[6] The original defendants were John C. Pittenger, Secretary of Education of Pennsylvania, and Grace M. Sloan, Treasurer of Pennsylvania. A number of additional parties were permitted by the District Court to intervene as defendants. Some of the individual intervenors are parents of children attending nonpublic, nonsectarian schools, who receive benefits under the challenged Acts either directly or through their schools; others are the parents of children

A three-judge court was convened pursuant to 28 U. S. C. §§ 2281, 2284. After an evidentiary hearing, the court entered its final judgment. 374 F. Supp. 639. In that judgment the court unanimously upheld the constitutionality of the textbook loan program authorized by Act 195. 374 F. Supp., at 657–658. By a divided vote the court also upheld the constitutionality of Act 194's provision of auxiliary services to children in nonpublic elementary and secondary schools and Act 195's authorization of loans of instructional materials directly to nonpublic elementary and secondary schools. 374 F. Supp., at 653–659. The court unanimously invalidated that portion of Act 195 authorizing the expenditure of commonwealth funds for the purchase of instructional equipment for loan to nonpublic schools, but only to the extent that the provision allowed the loan of equipment "which from its nature can be diverted to religious purposes." 374 F. Supp., at 662. The court gave as examples projection and recording equipment. *Id.*, at 660–661. By a vote of 2–1, the court upheld this provision of Act 195 insofar as it authorizes the loan of instructional equipment that cannot be readily diverted to religious uses. 374 F. Supp., at 660–661.

Except with respect to that provision of Act 195 which permits loan of instructional equipment capable of diversion, therefore, the plaintiffs' request for preliminary and final injunctive relief was denied. The plaintiffs (hereinafter the appellants) appealed directly to this Court, pursuant to 28 U. S. C. § 1253.[7] We noted probable jurisdiction. 419 U. S. 822.

---

attending nonpublic, church-related schools, who are benefited directly or indirectly by the Acts. One organizational intervenor is an association of nonpublic, nonsectarian schools; the other organizational intervenor is a nonpublic, nonsectarian school. 374 F. Supp., at 643.

[7] The appellants had alleged in their complaint that the statutes

## II

In judging the constitutionality of the various forms of assistance authorized by Acts 194 and 195, the District Court applied the three-part test that has been clearly stated, if not easily applied, by this Court in recent Establishment Clause cases. See, *e. g., Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 772–773; *Lemon* v. *Kurtzman,* 403 U. S. 602, 612–613. First, the statute must have a secular legislative purpose. *E. g., Epperson* v. *Arkansas,* 393 U. S. 97. Second, it must have a "primary effect" that neither advances nor inhibits religion. *E. g., School District of Abington Township* v. *Schempp,* 374 U. S. 203. Third, the statute and its administration must avoid excessive government entanglement with religion. *E. g., Walz* v. *Tax Comm'n,* 397 U. S. 664.

These tests constitute a convenient, accurate distillation of this Court's efforts over the past decades to evaluate a wide range of governmental action challenged as violative of the constitutional prohibition against laws "respecting an establishment of religion," and thus provide the proper framework of analysis for the issues presented in the case before us. It is well to emphasize,

---

violate the Free Exercise Clause, as well as the Establishment Clause, arguing that compulsory taxation for the support of religious schools interfered with the free exercise of religion. The District Court held that "the impact of whatever min[u]scule burden of taxation which results to [the appellants] from the expenditures in question has no effect upon the free exercise of their religion." *Id.,* at 662. Judge Higginbotham, who concurred in part and dissented in part, did not reach the free exercise question. See *id.,* at 680. The appellants have not renewed their free exercise challenge in this Court. Nor have the appellees sought review of that segment of the District Court order invalidating so much of Act 195 as authorized loans of instructional equipment capable of being diverted to religious purposes. Consequently, neither of those issues is now before us.

however, that the tests must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired. See *Tilton* v. *Richardson,* 403 U. S. 672, 677–678 (plurality opinion of BURGER, C. J.).

Primary among the evils against which the Establishment Clause protects "have been 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' *Walz* v. *Tax Comm'n, supra,* at 668; *Lemon* v. *Kurtzman, supra,* at 612." *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 772. The Court has broadly stated that "[n]o tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." *Everson* v. *Board of Education,* 330 U. S. 1, 16. But it is clear that not all legislative programs that provide indirect or incidental benefit to a religious institution are prohibited by the Constitution. See *Zorach* v. *Clauson,* 343 U. S. 306, 312; *Lemon* v. *Kurtzman, supra,* at 614. "The problem, like many problems in constitutional law, is one of degree." *Zorach* v. *Clauson, supra,* at 314.

## III

The District Court held that the textbook loan provisions of Act 195 are constitutionally indistinguishable from the New York textbook loan program upheld in *Board of Education* v. *Allen,* 392 U. S. 236. We agree. Approval of New York's textbook loan program in the *Allen* case was based primarily on this Court's earlier decision in *Everson* v. *Board of Education, supra,* holding that the constitutional prohibition against laws "respect-

ing an establishment of religion" did not prevent "New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools." 330 U. S., at 17. Similarly, the Court in *Allen* found that the New York textbook law "merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools." 392 U. S., at 243–244. The Court conceded that provision of free textbooks might make it "more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in *Everson* and does not alone demonstrate an unconstitutional degree of support for a religious institution." *Id.,* at 244.

Like the New York program, the textbook provisions of Act 195 extend to all schoolchildren the benefits of Pennsylvania's well-established policy of lending textbooks free of charge to elementary and secondary school students.[8]

---

[8] New York in a single statute authorized the loan of textbooks without charge to students attending both public and nonpublic schools. N. Y. Educ. Law § 701; see *Board of Education* v. *Allen,* 392 U. S. 236, 239. The Pennsylvania General Assembly has used two separate provisions of the Public School Code of 1949 to accomplish the same result. Pennsylvania Stat. Ann., Tit. 24, § 8–801, requires that textbooks be provided free of charge for use in the Pennsylvania public schools. Act 195, Pa. Stat. Ann., Tit. 24, § 9–972, provides the authorization for the loan of textbooks to nonpublic elementary and secondary school students. So long as the textbook loan program includes all schoolchildren, those in public as well as those in private schools, it is of no constitutional significance whether the general program is codified in one statute or two. See *Committee*

As in *Allen,* Act 195 provides that the textbooks are to be lent directly to the student, not to the nonpublic school itself, although, again as in *Allen,* the administrative practice is to have student requests for the books filed initially with the nonpublic school and to have the school authorities prepare collective summaries of these requests which they forward to the appropriate public officials. See *Board of Education* v. *Allen, supra,* at 244 n. 6.[9] Thus, the financial benefit of Pennsylvania's textbook program, like New York's, is to parents and children, not to the nonpublic schools.[10]

Under New York law the books that could be lent were limited to textbooks "which are designated for use in any public, elementary or secondary schools of the state or are approved by any boards of education, trustees or other school authorities." N. Y. Educ. Law § 701 (3). The law was construed by the New York Court of Appeals to apply solely to secular textbooks. *Board of Education* v. *Allen,* 20 N. Y. 2d 109, 117, 228 N. E. 2d 791, 794. Act 195 similarly limits the books that may be lent to "textbooks which are acceptable for use in any public, elementary, or secondary school of the Commonwealth."[11] Moreover, the record in the case

---

*for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 782 n. 38.

[9] Under both the Pennsylvania and New York textbook programs the nonpublic schools are permitted to store on their premises the textbooks being lent to the students. Compare Department of Education, Commonwealth of Pennsylvania, Guidelines for the Administration of Acts 194 and 195, § 4.6, with *Board of Education* v. *Allen, supra,* at 244 n. 6.

[10] In Pennsylvania, as in New York, prior to commencement of the state-supported textbook loan program, the parents of nonpublic school children had to purchase their own textbooks. See 374 F. Supp., at 671 n. 11 (opinion of Higginbotham, J.).

[11] Indeed, under the statutory scheme approved in *Allen,* the books lent to nonpublic school students might never in fact have been approved for use in any public school of the State. The statute per-

before us, like the record in *Allen,* see, *e. g.,* 392 U. S., at 244–245, 248, contains no suggestion that religious textbooks will be lent or that the books provided will be used for anything other than purely secular purposes.

In sum, the textbook loan provisions of Act 195 are in every material respect identical to the loan program approved in *Allen.* Pennsylvania, like New York, "merely makes available to all children the benefits of a general program to lend school books free of charge." As such, those provisions of Act 195 do not offend the constitutional prohibition against laws "respecting an establishment of religion." [12]

## IV

Although textbooks are lent only to students, Act 195 authorizes the loan of instructional material and equip-

---

mitted the loan of books initially selected for use by the nonpublic schools themselves, subject only to subsequent approval by "any boards of education." See *Board of Education* v. *Allen, supra,* at 269–272 (Fortas, J., dissenting). In contrast, only those books which have the antecedent approval of Pennsylvania school officials qualify for loans under Act 195. 374 F. Supp., at 658.

[12] The New Jersey textbook provisions invalidated in *Public Funds for Public Schools* v. *Marburger,* 358 F. Supp. 29, aff'd, 417 U. S. 961, unlike the New York textbook program involved in *Allen* and the Pennsylvania program now before us, were not designed to extend to all schoolchildren of the State, whether attending public or nonpublic schools, the benefits of state-loaned textbooks. Although New Jersey *public* school children were *lent* their textbooks, § 5 of the Nonpublic Elementary and Secondary Education Act, challenged in *Marburger,* provided that the State Commissioner of Education would reimburse the parents of *nonpublic* schoolchildren for money spent to *purchase* secular, nonideological textbooks. The District Court based its decision that the textbook provisions violated the constitutional prohibition against laws "respecting an establishment of religion" on the fact that the assistance provided—reimbursement for purchased textbooks—was not extended to parents of all students, but rather was directed exclusively to parents whose children were enrolled in nonpublic, primarily religious schools. 358 F. Supp., at 36.

ment directly to qualifying nonpublic elementary and secondary schools in the Commonwealth. The appellants assert that such direct aid to Pennsylvania's nonpublic schools, including church-related institutions, constitutes an impermissible establishment of religion.

Act 195 is accompanied by legislative findings that the welfare of the Commonwealth requires that present and future generations of schoolchildren be assured ample opportunity to develop their intellectual capacities. Act 195 is intended to further that objective by extending the benefits of free educational aids to every schoolchild in the Commonwealth, including nonpublic school students who constitute approximately one quarter of the school-children in Pennsylvania. Act 195, § 1 (a), Pa. Stat. Ann., Tit. 24, § 9–972 (a). We accept the legitimacy of this secular legislative purpose. Cf. *Lemon* v. *Kurtzman,* 403 U. S., at 609, 613; *Sloan* v. *Lemon,* 413 U. S. 825, 829–830. But we agree with the appellants that the direct loan of instructional material and equipment has the unconstitutional primary effect of advancing religion because of the predominantly religious character of the schools benefiting from the Act.[13]

The only requirement imposed on nonpublic schools to qualify for loans of instructional material and equipment is that they satisfy the Commonwealth's compulsory-attendance law by providing, in the English language, the subjects and activities prescribed by the standards of the State Board of Education. Pa. Stat. Ann., Tit. 24, § 13–1327. Commonwealth officials, as a matter of

---

[13] Because we have concluded that the direct loan of instructional material and equipment to church-related schools has the impermissible effect of advancing religion, there is no need to consider whether such aid would result in excessive entanglement of the Commonwealth with religion through "comprehensive, discriminating, and continuing state surveillance." *Lemon* v. *Kurtzman,* 403 U. S. 602, 619.

state policy, do not inquire into the religious characteristics, if any, of the nonpublic schools requesting aid pursuant to Act 195. The Coordinator of Nonpublic School Services, the chief administrator of Acts 194 and 195, testified that a school would not be barred from receiving loans of instructional material and equipment even though its dominant purpose was the inculcation of religious values, even if it imposed religious restrictions on admissions or on faculty appointments, and even if it required attendance at classes in theology or at religious services. In fact, of the 1,320 nonpublic schools in Pennsylvania that comply with the requirements of the compulsory-attendance law and thus qualify for aid under Act 195, more than 75% are church-related or religiously affiliated educational institutions. Thus, the primary beneficiaries of Act 195's instructional material and equipment loan provisions, like the beneficiaries of the "secular educational services" reimbursement program considered in *Lemon* v. *Kurtzman,* and the parent tuition-reimbursement plan considered in *Sloan* v. *Lemon,* are nonpublic schools with a predominant sectarian character.[14]

It is, of course, true that as part of general legislation made available to all students, a State may include church-related schools in programs providing bus transportation, school lunches, and public health facilities—secular and nonideological services unrelated to the primary, religion-oriented educational function of the sectarian school. The indirect and incidental benefits to church-related schools from those programs do not offend the constitutional prohibition against establish-

---

[14] In *Lemon* v. *Kurtzman, supra,* at 610, this Court found that 96% of the nonpublic elementary and secondary school students in Pennsylvania in 1969 attended church-related schools. See also *Sloan* v. *Lemon,* 413 U. S. 825, 830.

ment of religion. See, *e. g., Everson* v. *Board of Education,* 330 U. S. 1; *Lemon* v. *Kurtzman, supra,* at 616–617; *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S., at 775. But the massive aid provided the church-related nonpublic schools of Pennsylvania by Act 195 is neither indirect nor incidental.

For the 1972–1973 school year the Commonwealth authorized just under $12 million of direct aid to the predominantly church-related nonpublic schools of Pennsylvania through the loan of instructional material and equipment pursuant to Act 195.[15] To be sure, the material and equipment that are the subjects of the loan— maps, charts, and laboratory equipment, for example— are "self-polic[ing], in that starting as secular, nonideological and neutral, they will not change in use." 374 F. Supp., at 660. But faced with the substantial amounts of direct support authorized by Act 195, it would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools and to then characterize Act 195 as channeling aid to the secular without providing direct aid to the sectarian. Even

---

[15] An additional $4,670,000 was appropriated in the 1972–1973 school year for the acquisition of textbooks for loan to nonpublic school students pursuant to Act 195. The total 1972–1973 appropriation under Act 195 was $16,660,000. The appropriation was increased by $900,000 to $17,560,000 for the 1973–1974 school year.

The potentially divisive political effect of aid programs like Act 195, which are dependent on continuing annual appropriations and which generate increasing demands as costs and population grow, was emphasized by this Court in *Lemon* v. *Kurtzman, supra,* at 622–624, and *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S., at 794–798. "[W]hile the prospect of such divisiveness may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by the decisions of this Court, it is certainly a 'warning signal' not to be ignored." *Id.,* at 797–798.

though earmarked for secular purposes, "when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission," state aid has the impermissible primary effect of advancing religion. *Hunt* v. *McNair,* 413 U. S. 734, 743.

The church-related elementary and secondary schools that are the primary beneficiaries of Act 195's instructional material and equipment loans typify such religion-pervasive institutions. The very purpose of many of those schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. See *Lemon* v. *Kurtzman,* 403 U. S., at 616–617. Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. "[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined." *Id.,* at 657 (opinion of BRENNAN, J.). See generally Freund, Public Aid to Parochial Schools, 82 Harv. L. Rev. 1680, 1688–1689. For this reason, Act 195's direct aid to Pennsylvania's predominantly church-related, nonpublic elementary and secondary schools, even though ostensibly limited to wholly neutral, secular instructional material and equipment, inescapably results in the direct and substantial advancement of religious activity, cf. *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S., at 781–783, and n. 39, and thus constitutes an impermissible establishment of religion.[16]

---

[16] Our conclusion that Act 195's instructional-material and equipment-loan provisions are unconstitutional is directly supported, if not compelled, by this Court's affirmance last Term of *Public Funds for Public Schools* v. *Marburger,* 358 F. Supp. 29, aff'd, 417 U. S.

## V

Unlike Act 195, which provides only for the loan of teaching material and equipment, Act 194 authorizes the Secretary of Education, through the intermediate units, to supply professional staff, as well as supportive materials, equipment, and personnel, to the nonpublic schools of the Commonwealth. The "auxiliary services" authorized by Act 194—remedial and accelerated instruction, guidance counseling and testing, speech and hearing services—are provided directly to nonpublic school children with the appropriate special need. But the services are provided only on the nonpublic school premises, and only when "requested by nonpublic school representatives." Department of Education, Commonwealth of Pennsylvania, Guidelines for the Administration of Acts 194 and 195, § 1.3.

The legislative findings accompanying Act 194 are virtually identical to those in Act 195: Act 194 is intended to assure full development of the intellectual capacities of the children of Pennsylvania by extending the bene-

961. The *Marburger* District Court invalidated as violating the constitutional prohibition against establishment of religion New Jersey's provision of instructional material and equipment to nonpublic elementary and secondary schools. New Jersey's program did not differ in any material respect from the loan provisions of Act 195. See 358 F. Supp., at 36–37. After finding that the nonpublic schools aided, for the most part, were church-related or religiously affiliated educational institutions, *id.*, at 34, the court held that the program had a primary effect of advancing religion. *Id.*, at 37. The court also held, as did the District Court in the case before us, that excessive entanglement of church and state would result from attempts to police use of material and equipment that were readily divertible to religious uses. *Id.*, at 38–39. This Court's affirmance of the result in *Marburger* was a decision on the merits, entitled to precedential weight. See *Edelman* v. *Jordan*, 415 U. S. 651, 670–671; cf. *Cincinnati, N. O. & T. P. R. Co.* v. *United States*, 400 U. S. 932, 935 (WHITE, J., dissenting from summary affirmance).

fits of free auxiliary services to all students in the Commonwealth. Act 194, § 1 (a), Pa. Stat. Ann., Tit. 24, § 9–972 (a). The appellants concede the validity of this secular legislative purpose. Nonetheless, they argue that Act 194 constitutes an impermissible establishment of religion because the auxiliary services are provided on the premises of predominantly church-related schools.[17]

In rejecting the appellants' argument, the District Court emphasized that "auxiliary services" are provided directly to the children involved and are expressly limited to those services which are secular, neutral, and nonideological. The court also noted that the instruction and counseling in question served only to supplement the basic, normal educational offerings of the qualifying nonpublic schools. Any benefits to church-related schools that may result from the provision of such services, the District Court concluded, are merely incidental and indirect, and thus not impermissible. See 374 F. Supp., at 656–657. The court also held that no continuing supervision of the personnel providing auxiliary services would be necessary to establish that Act 194's secular limitations were observed or to guarantee that a member of the auxiliary services staff had not "succumb[ed] to sectarianization of his or her professional work." 374 F. Supp., at 657.

---

[17] The appellants do not challenge, and we do not question, the authority of the Pennsylvania General Assembly to make free auxiliary services available to all students in the Commonwealth, including those who attend church-related schools. Contrary to the argument advanced in a separate opinion filed today, therefore, this case presents no question whether "the Constitution permits the States to give special assistance to some of its children whose handicaps prevent their deriving the benefit normally anticipated from the education required to become a productive member of society and, at the same time, to deny those benefits to other children *only because* they attend a Lutheran, Catholic, or other church-sponsored school . . . ." *Post,* at 386–387.

We need not decide whether substantial state expenditures to enrich the curricula of church-related elementary and secondary schools,[18] like the expenditure of state funds to support the basic educational program of those schools, necessarily result in the direct and substantial advancement of religious activity.[19] For decisions of this Court make clear that the District Court erred in relying entirely on the good faith and professionalism of the secular teachers and counselors functioning in church-related schools to ensure that a strictly nonideological posture is maintained.

In *Earley* v. *DiCenso*, a companion case to *Lemon* v. *Kurtzman, supra,* the Court invalidated a Rhode Island statute authorizing salary supplements for teachers of secular subjects in nonpublic schools. The Court expressly rejected the proposition, relied upon by the District Court in the case before us, that it was sufficient for the State to assume that teachers in church-related schools would succeed in segregating their religious beliefs from their secular educational duties.

> "We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment. . . .
>
> ". . . But the potential for impermissible fostering of religion is present. . . . The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion . . . .

---

[18] Because Acts 194 and 195 impose identical qualification requirements, compare Act 194, § 1 (c), Pa. Stat. Ann., Tit. 24, § 9–972 (c), with Act 195, §§ 1 (c), (e), Pa. Stat. Ann., Tit. 24, §§ 9–972 (c), (e), the same schools are eligible for aid under each Act.

[19] More than $14 million was appropriated in the 1972–1973 school year to provide auxiliary services for nonpublic school students pursuant to Act 194. The amount was increased to $17,880,000 for the 1973–1974 school year.

"A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. . . ." 403 U. S., at 618–619.

The prophylactic contacts required to ensure that teachers play a strictly nonideological role, the Court held, necessarily give rise to a constitutionally intolerable degree of entanglement between church and state. *Id.,* at 619. The same excessive entanglement would be required for Pennsylvania to be "certain," as it must be, that Act 194 personnel do not advance the religious mission of the church-related schools in which they serve. *Public Funds for Public Schools* v. *Marburger,* 358 F. Supp. 29, 40–41, aff'd, 417 U. S. 961.[20]

That Act 194 authorizes state funding of teachers only for remedial and exceptional students, and not for normal students participating in the core curriculum, does not distinguish this case from *Earley* v. *DiCenso* and *Lemon* v. *Kurtzman, supra.* Whether the subject is "remedial reading," "advanced reading," or simply "reading," a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists. The likelihood of inadvertent fostering of re-

---

[20] In addition to invalidating New Jersey's provision of instructional material and equipment to nonpublic schools, see n. 16, *supra,* the District Court in *Marburger* struck down the State's program to supply nonpublic schools with "auxiliary services." New Jersey defined "auxiliary services" in substantially the same manner as Pennsylvania, and the administration of the New Jersey program did not differ significantly from the administration of Act 194. See 358 F. Supp., at 39. The District Court held that the auxiliary services program "is unconstitutional by reason of the church-state administrative entanglement it would produce." *Id.,* at 40. This Court's affirmance of *Marburger* is a decision on the merits as to the constitutionality of New Jersey's auxiliary-services program, and is entitled to precedential weight.

ligion may be less in a remedial arithmetic class than in a medieval history seminar, but a diminished probability of impermissible conduct is not sufficient: "The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion." 403 U. S., at 619. And a state-subsidized guidance counselor is surely as likely as a state-subsidized chemistry teacher to fail on occasion to separate religious instruction and the advancement of religious beliefs from his secular educational responsibilities.[21]

The fact that the teachers and counselors providing auxiliary services are employees of the public intermediate unit, rather than of the church-related schools in which they work, does not substantially eliminate the need for continuing surveillance. To be sure, auxiliary-services personnel, because not employed by the non-public schools, are not directly subject to the discipline of a religious authority. Cf. *Lemon* v. *Kurtzman,* 403 U. S., at 618. But they are performing important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained. See *id.,* at 618–619.

---

[21] The "speech and hearing services" authorized by Act 194, at least to the extent such services are diagnostic, seem to fall within that class of general welfare services for children that may be provided by the State regardless of the incidental benefit that accrues to church-related schools. See, *e. g., Everson* v. *Board of Education,* 330 U. S. 1. Although the Act contains a severability clause, Act 194, § 2, in view of the fact that speech and hearing services constitute a minor portion of the "auxiliary services" authorized by the Act, we cannot assume that the Pennsylvania General Assembly would have passed the law solely to provide such aid. See *Sloan* v. *Lemon,* 413 U. S., at 833–834. Indeed, none of the appellees has suggested that the severability clause be utilized to save any portion of Act 194 in the event this Court finds the major substance of the Act constitutionally invalid.

The potential for impermissible fostering of religion under these circumstances, although somewhat reduced, is nonetheless present. To be certain that auxiliary teachers remain religiously neutral, as the Constitution demands, the State would have to impose limitations on the activities of auxiliary personnel and then engage in some form of continuing surveillance to ensure that those restrictions were being followed.[22]

In addition, Act 194, like the statutes considered in *Lemon* v. *Kurtzman, supra,* and *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* creates a serious potential for divisive conflict over the issue of aid to religion—"entanglement in the broader sense of continuing political strife." *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S., at 794. The recurrent nature of the appropriation process guarantees annual reconsideration of Act 194 and the prospect of repeated confrontation between proponents and opponents of the auxiliary-services program. The Act thus provides successive opportunities for political fragmentation and division along religious lines, one of the principal evils against which the Establishment Clause was intended to protect. See *Lemon* v. *Kurtzman,* 403 U. S., at 622–623. This potential for political entanglement, together with the administrative entanglement which would be necessary to ensure that auxiliary-services personnel remain strictly neutral and nonideological when functioning in church-related schools, compels the conclusion that Act 194 violates the constitutional prohibition against laws "respecting an establishment of religion."

---

[22] The presence of auxiliary teachers in church-related schools, moreover, has the potential for provoking controversy between the Commonwealth and religious authorities over the extent of the teachers' responsibilities and the meaning of the legislative and administrative restrictions on the content of their instruction. See *Lemon* v. *Kurtzman,* 403 U. S., at 619.

The judgment of the District Court as to Act 194 is reversed; its judgment as to the textbook provisions of Act 195 is affirmed, but as to that Act's other provisions now before us its judgment is reversed.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, concurring in part and dissenting in part.

I join in the reversal of the District Court's judgment insofar as that judgment upheld the constitutionality of Act 194 and the provisions of Act 195 respecting instructional materials and equipment, but dissent from Part III and the affirmance of the judgment upholding the constitutionality of the textbook provisions of Act 195.

A three-factor test by which to determine the compatibility with the Establishment Clause of state subsidies of sectarian educational institutions has evolved over 50 years of this Court's stewardship in the field. The law in question must, first, reflect a clearly secular legislative purpose; second, have a primary effect[1] that neither

---

[1] The Court emphasized in *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 783–784, n. 39 (1973), that "primary effect" did not connote a requirement that the Court render an ultimate judgment on the effect of the statute in question. The Court stated:

"Appellees, focusing on the term 'principal or primary effect' which this Court has utilized in expressing the second prong of the three-part test, . . . have argued that the Court must decide in these cases whether the 'primary' effect of New York's tuition grant program is to subsidize religion or to promote these legitimate secular objectives. . . . We do not think that such metaphysical judgments are either possible or necessary. Our cases simply do not support the notion that a law found to have a 'primary' effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion. . . ."

advances nor inhibits religion; and, third, avoid excessive government entanglement with religion. But four years ago, the Court, albeit without express recognition of the fact, added a significant fourth factor to the test: "A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs." *Lemon* v. *Kurtzman*, 403 U. S. 602, 622 (1971). The evaluation of this factor in determining compatibility of a state subsidy law with the Establishment Clause is essential, said the Court, because:

"In a community where . . . a large number of pupils are served by church-related schools, it can be assumed that state assistance will entail considerable political activity. Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.

"Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, *but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect. . . .* The potential divisiveness of such conflict is a threat to the normal political process. . . . It conflicts with our whole history and tradition to permit questions of

the Religion Clauses to assume such importance in our legislatures and in our elections that they could divert attention from the myriad issues and problems that confront every level of government. . . .

"*. . . Here we are confronted with successive and very likely permanent annual appropriations that benefit relatively few religious groups. Political fragmentation and divisiveness on religious lines are thus likely to be intensified.*

"*The potential for political divisiveness related to religious belief and practice is aggravated . . . by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow. . . ." Id.*, at 622–623. (Emphasis added.)

This factor was key in *Kurtzman*'s determination that Pennsylvania and Rhode Island statutes providing state aid to church-related elementary and secondary schools violated the Establishment Clause. The Pennsylvania statute provided financial support by way of reimbursement for the cost of teachers' salaries, textbooks, and instructional materials in specified secular subjects. The Rhode Island statute provided a program under which the State paid directly to teachers in nonpublic schools a supplement of 15% of their annual salary.

*Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756 (1973), decided two years later, emphasized the importance to be attached by judges to this fourth factor: "One factor of recurring significance in this weighing process is the potentially divisive political effect of an aid program." *Id.*, at 795. The Court held that the factor applied "with peculiar force to the New York statute now before us." *Id.*, at 796. That statute created three aid programs. The first provided for direct money grants to be used for maintenance and

repair of facilities to ensure the students' welfare, health, and safety. The second established a tuition-reimbursement plan for parents of children attending nonpublic elementary schools. The third provided tax relief for parents not qualifying for tuition reimbursements. Stating that "while the prospect of [political] divisiveness may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by the decisions of this Court, it is certainly a 'warning signal' not to be ignored," *id.,* at 797–798, the Court held that "in light of all relevant considerations," each of the New York programs had a " 'primary effect that advances religion' and offends the constitutional prohibition against laws 'respecting an establishment of religion.' " *Id.,* at 798.

The Court today also relies on the factor of divisive political potential but only as support for its holding that Act 194 is an unconstitutional law "respecting an establishment of religion," stating:

> "In addition, Act 194, like the statutes considered in [*Kurtzman* and *Nyquist*] creates a serious potential for divisive conflict over the issue of aid to religion—'entanglement in the broader sense of continuing political strife.' . . . The recurrent nature of the appropriation process guarantees annual reconsideration of Act 194 and the prospect of repeated confrontation between proponents and opponents of the auxiliary-services program. The Act thus provides successive opportunities for political fragmentation and division along religious lines, one of the principal evils against which the Establishment Clause was intended to protect." *Ante,* at 372.

Contrary to the plain and explicit teaching of *Kurtzman* and *Nyquist,* however, and inconsistently with its own treatment of Act 194, the plurality, in considering

the constitutionality of Act 195 says not a single word
about the political-divisiveness factor in Part III of the
opinion upholding the textbook loan program created by
that Act, and makes only a passing footnote reference to
the factor, without evaluation of its bearing on the result,
in holding that Act 195's program for loans of instruc-
tional materials and equipment constitutes Act 195 in
that respect "direct aid to Pennsylvania's predominantly
church-related, nonpublic elementary and secondary
schools, even though ostensibly limited to wholly neutral,
secular instructional material and equipment, [that] in-
escapably results in the direct and substantial advance-
ment of religious activity . . . and thus constitutes an im-
permissible establishment of religion." *Ante,* at 366.

I recognize that the plurality was on the horns of a di-
lemma. The plurality notes that the total 1972–1973
appropriation under Act 195 was $16,660,000, of which
$4,670,000 was appropriated to finance the textbook pro-
gram. *Ante,* at 365 n. 15. The plurality notes further
that "aid programs like Act 195 . . . are dependent on con-
tinuing annual appropriations . . . which generate in-
creasing demands as costs and population grow . . . ,"
*ibid.,* and, indeed, that the total Act 195 appropriation
was increased $900,000 to $17,560,000 for the 1973–1974
school year. Plainly then, as in *Nyquist,* the political-
divisiveness factor applies "with peculiar force to the . . .
statute now before us." But to comply with *Nyquist,*
as is required, the plurality obviously must attach deter-
minative weight to the factor as respects both the text-
book loan and instructional materials and equipment loan
provisions, since both are inextricably intertwined in Act
195.[2] For in light of the massive appropriations in-

---

[2] *Kurtzman* supports this conclusion:

"We have already noted that modern governmental programs have
self-perpetuating and self-expanding propensities. These internal

volved, the plurality would be hard put to explain how the factor weighs determinatively against the validity of the instructional materials loan provisions, and not also against the validity of the textbook loan provisions. The plurality therefore would extricate itself from the horns of the dilemma by simply ignoring the factor in the weighing process.

But however much this evasion may be tolerable in the case of the instructional materials loan provisions, since these are invalidated on other grounds, responsibility for evaluating the weight to be accorded the factor cannot be evaded, in the case of the textbook loan provisions, by relying, as the plurality does, upon its agreement with the District Court that the textbook loan program is indistinguishable from the New York textbook loan program upheld in *Board of Education* v. *Allen*, 392 U. S. 236 (1968). For *Allen*, which I joined, was decided before *Kurtzman* ordained that the political-divisiveness factor must be involved in the weighing process, and understandably neither the parties to *Allen* nor the Court addressed that factor in that case. But whether or not *Allen* can withstand overruling in light of *Kurtzman* and *Nyquist*, which I question, it is clear that *Kurtzman*—which, I repeat, applied the factor to a Pennsylvania program that included reimbursement for the cost of textbooks—requires that the plurality weigh the factor in the instant case. Further, giving the factor the weight that *Kurtzman* and *Nyquist* require, compels, in my view

---

pressures are only enhanced when the schemes involve institutions whose legitimate needs are growing and whose interests have substantial political support. Nor can we fail to see that in constitutional adjudication some steps, which when taken were thought to approach 'the verge,' have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a 'downhill thrust' easily set in motion but difficult to retard or stop." 403 U. S. 602, 624 (1971).

the conclusion that the textbook loan program of Act 195, equally with the program for loan of instructional materials and equipment, violates the Establishment Clause. The plurality's answer is that a difference in result is justified because Act 195 distinguishes between recipients of the loans: textbooks are lent to students, while instructional material and equipment are lent directly to the schools. That answer will not withstand analysis.

First, it is pure fantasy to treat the textbook program as a loan to students. It is true that, like the New York statute in *Allen,* Act 195 in terms talks of loans by the State of acceptable secular textbooks directly to students attending nonpublic schools. But even the plurality acknowledges that "the administrative practice is to have student requests for the books filed initially with the nonpublic school and to have the school authorities prepare collective summaries of these requests which they forward to the appropriate public officials. . . ." *Ante,* at 361. Further, "the nonpublic schools are permitted to store on their premises the textbooks being lent to the students." *Ante,* at 361 n. 9. Even if these practices were also followed under the New York statute, the regulations implementing Act 195 make clear, as the record in *Allen* did not, that the nonpublic school in Pennsylvania is something more than a conduit between the State and pupil. The Commonwealth has promulgated "Guidelines for the Administration of Acts 194 and 195" to implement the statutes. These regulations, unlike those upheld in *Allen,* constitute a much more intrusive and detailed involvement of the State and its processes into the administration of nonpublic schools. The whole business is handled by the schools and public authorities, and neither parents nor students have a say. The guidelines make crystal clear that the nonpublic school, not its pupils, is the motivating force behind the textbook

loan, and that virtually the entire loan transaction is to be, and is in fact, conducted between officials of the non-public school, on the one hand, and officers of the State, on the other.

For example, § 4.3 of the Guidelines requires that on or before March 1 of each year, an official of each non-public school submit to the Pennsylvania Department of Education a loan request for the desired textbooks. The requests must be submitted on standardized forms "distributed by the Department of Education . . . to each nonpublic school or the appropriate chief administrator." Section 4.6 of the Guidelines provides that the "[t]ext-books requested will be shipped directly to the appropri-ate nonpublic school." Thus, although in terms the form provided by the Commonwealth for parents of non-public school students states that the parents of these pupils request the loan of textbooks directly from the State, the form is not returnable to the State, but to the nonpublic school, which tabulates the requests and sub-mits its total to the State. Then, after the submission by the nonpublic school is approved by the appropriate state official, the books are transported not to the chil-dren whose parents ostensibly made the request, but directly to the nonpublic school, where they are physi-cally retained when not in use in the classroom.

Indeed, the Guidelines make no attempt to mask the true nature of the loan transaction. In explicit words § 4.10 describes the transaction: "Textbooks *loaned to the nonpublic schools:* (a) shall be maintained on an inventory by the nonpublic school." (Emphasis added.) Section 4.11 provides: "It is presumed that textbooks on *loan to nonpublic schools* after a period of time will be lost, missing, obsolete or worn out. This information should be communicated to the Department of Educa-tion. After a period of six years, textbooks shall be

declared unserviceable and the disposal of such shall be at the discretion of the Secretary of Education." (Emphasis added.) Thus, the loan of the textbooks is treated by the regulations as what it in fact is: a loan from the State directly to the nonpublic school. Finally, § 4.12 completely removes any possible doubt. It provides:

> "The nonpublic school or the agency which it is a member shall be responsible for maintaining on file certificates of requests from parents of children for all textbook materials loaned to them under this act. The file must be open to inspection by the appropriate authority. A letter certifying the certificates on file shall accompany all loan requests."

Plainly, then, whatever may have been the case under the New York statute sustained in *Allen*, the loan ostensibly to students is, under Act 195, a loan in fact to the schools. In this regard, it should be observed that sophisticated attempts to avoid the Constitution are just as invalid as simple-minded ones. *Lane* v. *Wilson*, 307 U. S. 268, 275 (1939).

Second, in any event, *Allen* itself made clear that, far from providing a *per se* immunity from examination of the substance of the State's program, even if the fact were, and it is not, that textbooks are loaned to the children rather than to the schools, that is only one among the factors to be weighed in determining the compatibility of the program with the Establishment Clause. *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S., at 781. And, clearly, in the context of application of the factor of political divisiveness, it is wholly irrelevant whether the loan is to the children or to the school. A divisive political potential exists because aid programs, like Act 195, are dependent on continuing

annual appropriations, and Act 195's textbook loan program, even if we accepted it as a form of loans to students, involves increasingly massive sums now approaching $5,000,000 annually.[3]  It would blind reality to treat massive aid to nonpublic schools, under the guise of loans to the students, as not creating "a serious potential for divisive conflict over the issue of aid to religion."  *Ante,* at 372.[4]  The focus of the textbook loan program in terms of massive financial support for religious schools that creates the potential divisiveness is no less real than it is in the case of Act 195's instructional materials provisions and Act 194's invalidated program for auxiliary services. Act 195 is intended solely as a financial aid program to relieve the desperate financial plight of nonpublic, primarily parochial, schools.  The plurality suggests that it is immaterial that Act 195 has that cast, in contrast with New York's statute in *Allen* which authorized loans to students attending both public and nonpublic schools. *Ante,* at 360 n. 8.  On the contrary, Act 195's limitation of its financial support to aid to nonpublic school children exacerbates the potential for political divisive-

---

[3] I concede that I failed to apprehend the significance of the political-divisiveness factor in writing my separate opinion in *Kurtzman,* 403 U. S., at 642–661.

[4] The Court stated in *Nyquist,* 413 U. S., at 797 n. 56:

"The self-perpetuating tendencies of any form of government aid to religion have been a matter of concern running throughout our Establishment Clause cases.  In *Schempp,* the Court emphasized that it was 'no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment,' for what today is a 'trickling stream' may be a torrent tomorrow.  374 U. S., at 225.  See also *Lemon* v. *Kurtzman,* 403 U. S., at 624–625. But, to borrow the words from Mr. Justice Rutledge's forceful dissent in *Everson,* it is not alone the potential expandability of state tax aid that renders such aid invalid.  Not even 'three pence' could be assessed: 'Not the amount but "the principle of assessment was wrong." ' 330 U. S., at 40–41 (quoting from Madison's Memorial and Remonstrance)."

ness.[5]  "In this situation, where the underlying issue is
the deeply emotional one of Church-State relationships,
the potential for seriously divisive political consequences
needs no elaboration."  *Committee for Public Education
& Religious Liberty* v. *Nyquist, supra,* at 797.

Finally, the textbook loan provisions of Act 195, even
if ostensibly limiting loans to nonpublic school children,
violate the Establishment Clause for reasons independent
of the political-divisiveness factor.  As I have said, un-
like the New York statute in *Allen* which extended assist-
ance to all students, whether attending public or nonpub-
lic schools, Act 195 extends textbook assistance only to
a special class of students, children who attend nonpublic
schools which are, as the plurality notes, primarily re-
ligiously oriented.  The Act in that respect contains the
same fatal defect as the New Jersey statute held violative
of the Establishment Clause in *Public Funds for Public
Schools* v. *Marburger,* 358 F. Supp. 29 (NJ 1973), aff'd,
417 U. S. 961 (1974).  The statute there involved was
N. J. Stat. Ann. § 18A:58–63 which furnished state aid,
in amounts up to $10 for elementary school students and
up to $20 for high school students, to the parents of non-
public school students as reimbursement for the cost of

---

[5] Paraphrasing the Court's observation in *Nyquist, supra,* at 783:
"There has been no endeavor 'to guarantee the separation between
secular and religious educational functions and to ensure that State
financial aid supports only the former.' *Lemon* v. *Kurtzman, supra,*
at 613.  Indeed, it is precisely the function of [Act 195] to provide
assistance to private schools, the great majority of which are sec-
tarian.  By [relieving parents of their textbook bill] the State seeks
to relieve their financial burdens sufficiently to assure that they
continue to have the option to send their children to religion-
oriented schools.  And while the other purposes for that aid—to
perpetuate a pluralistic educational environment and to protect the
fiscal integrity of overburdened public schools—are certainly unex-
ceptionable, the effect of the aid is unmistakably to provide desired
financial support for nonpublic, sectarian institutions."

"secular, nonideological textbooks, instructional materials and supplies." We affirmed the holding of the three-judge court that "because the language of [the statute] limits the assistance provided therein only to parents of children who attend nonpublic, predominately religiously-affiliated schools and not to parents of all school children, we are satisfied that its primary effect is to advance religion and that it is thereby unconstitutional." 358 F. Supp., at 36. *Marburger* thus establishes that the plurality's reliance today upon *Allen* is clearly misplaced.

Indeed, that reliance is also misplaced in light of its own holding today invalidating the provisions of Act 195 respecting the loan of instructional materials and equipment. I have no doubt that such materials and equipment are tools that substantially enhance the quality of the secular education provided by the religiously oriented schools. But surely the heart tools of that education are the textbooks that are prescribed for use and kept at the schools, albeit formally at the request of the students. Thus, what the Court says of the instructional materials and equipment, *ante,* at 365–366, may be said perhaps even more accurately of the textbooks:

> "But faced with the substantial amounts of direct support authorized by Act 195, it would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools and to then characterize Act 195 as channeling aid to the secular without providing direct aid to the sectarian. Even though earmarked for secular purposes, 'when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission,' state aid has the impermissible primary effect of advancing religion."

In sum, I join the Court's opinion as to Parts I, II, IV,

and V, except that I would go further in Part IV and rest the invalidation of the provisions of Act 195 for loans of instructional materials and equipment also upon the political-divisiveness factor. I dissent from Part III.

MR. CHIEF JUSTICE BURGER, concurring in the judgment in part and dissenting in part.

I agree with the Court only insofar as it affirms the judgment of the District Court. My limited agreement with the Court as to this action leads me, however, to agree generally with the views expressed by MR. JUSTICE REHNQUIST and MR. JUSTICE WHITE in regard to the other programs under review. I especially find it difficult to accept the Court's extravagant suggestion of potential entanglement which it finds in the "auxiliary services" program of Act 194. Here, the Court's holding, it seems to me, goes beyond any prior holdings of this Court and, indeed, conflicts with our holdings in *Board of Education* v. *Allen,* 392 U. S. 236 (1968), and *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971). There is absolutely no support in this record or, for that matter, in ordinary human experience for the concern some see with respect to the "dangers" lurking in extending common, nonsectarian tools of the education process—especially remedial tools—to students in private schools. As I noted in my separate opinion in *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756 (1973), the "fundamental principle which I see running through our prior decisions in this difficult and sensitive field of law . . . is premised more on experience and history than on logic." *Id.,* at 802. Certainly, there is no basis in "experience and history" to conclude that a State's attempt to provide—through the services of its own state-selected professionals—the remedial assistance necessary for *all* its children poses the same potential for

unnecessary administrative entanglement or divisive po-
litical confrontation which concerned the Court in *Lemon*
v. *Kurtzman, supra*. Indeed, I see at least as much
potential for divisive political debate in opposition to
the crabbed attitude the Court shows in this case. See,
*e. g., ante,* at 371 n. 21.

If the consequence of the Court's holding operated
only to penalize *institutions* with a religious affiliation,
the result would be grievous enough; nothing in the
Religion Clauses of the First Amendment permits gov-
ernmental power to discriminate *against* or affirmatively
stifle religions or religious activity. *Everson* v. *Board of
Education,* 330 U. S. 1, 18 (1947). But this holding does
more: it penalizes *children*—children who have the mis-
fortune to have to cope with the learning process under
extraordinarily heavy physical and psychological burdens,
for the most part congenital. This penalty strikes them
not because of any act of theirs but because of their par-
ents' choice of religious exercise. This, as MR. JUSTICE
REHNQUIST effectively demonstrates, totally turns its
back on what MR. JUSTICE DOUGLAS wrote for the Court
in *Zorach* v. *Clauson,* 343 U. S. 306, 313–314 (1952),
particularly:

> "When the state encourages religious instruction or
> cooperates with religious authorities by adjusting the
> schedule of public events to sectarian needs, it fol-
> lows the best of our traditions. For it then respects
> the religious nature of our people and accommodates
> the public service to their spiritual needs."

To hold, as the Court now does, that the Constitution
permits the States to give special assistance to some of
its children whose handicaps prevent their deriving the
benefit normally anticipated from the education required
to become a productive member of society and, at the
same time, to deny those benefits to other children *only
because* they attend a Lutheran, Catholic, or other church-

sponsored school does not simply tilt the Constitution against religion; it literally turns the Religion Clauses on their heads. As MR. JUSTICE DOUGLAS said for the Court in *Zorach, supra,* this is

> "to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe."
> *Id.,* at 314.

The melancholy consequence of what the Court does today is to force the parent to choose between the "free exercise" of a religious belief by opting for a sectarian education for his child or to forgo the opportunity for his child to learn to cope with—or overcome—serious congenital learning handicaps, through remedial assistance financed by his taxes. Affluent parents, by employing private teaching specialists, will be able to cope with this denial of equal protection, which is, for me, a gross violation of Fourteenth Amendment rights, but all others will be forced to make a choice between their judgment as to their children's spiritual needs and their temporal need for special remedial learning assistance. One can only hope that, at some future date, the Court will come to a more enlightened and tolerant view of the First Amendment's guarantee of free exercise of religion, thus eliminating the denial of equal protection to children in church-sponsored schools, and take a more realistic view that carefully limited aid to children is not a step toward establishing a state religion—at least while this Court sits.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE WHITE joins, concurring in the judgment in part and dissenting in part.

Substantially for the reasons set forth in my opinion and those of THE CHIEF JUSTICE and MR. JUSTICE

WHITE in *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756 (1973), and *Sloan* v. *Lemon,* 413 U. S. 825 (1973), I would affirm the judgment of the District Court.

Two Acts of the Pennsylvania Legislature are under attack in this case. Act 195 includes a program that provides for the loan of textbooks free of charge to elementary and secondary school students attending nonpublic schools, just as other provisions of Pennsylvania law provide similar benefits to children attending public schools, Pa. Stat. Ann., Tit. 24, § 8–801. I agree with MR. JUSTICE STEWART that this program is constitutionally indistinguishable from the New York textbook loan program upheld in *Board of Education* v. *Allen,* 392 U. S. 236 (1968), and on the authority of that case I join the judgment of the Court insofar as it upholds the textbook loan program.

The Court strikes down other provisions of Act 195 dealing with instructional materials and equipment[1] because it finds that they have "the unconstitutional primary effect of advancing religion because of the predominantly religious character of the schools benefiting from the Act." *Ante,* at 363 (footnote omitted). This apparently follows from the high percentage of nonpublic schools that are "church-related or religiously affiliated educational institutions." *Ante,* at 364. The Court

---

[1] The District Court upheld these sections of Act 195 except insofar as they "permit[ted] the loan of instructional equipment which can be easily diverted to a religious use." 374 F. Supp. 639, 661 (ED Pa. 1974). The appellees have not sought review of this ruling. See *ante,* at 357–358, n. 7. My use of the term "instructional equipment" in this opinion is intended, therefore, to be coextensive with that portion of the program upheld by the District Court. See also 1972 Revisions to the Guidelines for the Administration of Acts 194 and 195, reproduced as Appendix A to Brief for Appellants.

thus again appears to follow "the unsupportable approach of measuring the 'effect' of a law by the percentage of" sectarian schools benefited. *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 804 (opinion of BURGER, C. J.). I find that approach to the "primary effect" branch of our three-pronged test no more satisfactory in the context of this instructional materials and equipment program than it was in the context of the tuition reimbursement and tax relief programs involved in *Nyquist, supra,* and *Sloan, supra.*

One need look no further than to the majority opinion for a demonstration of the arbitrariness of the percentage approach to primary effect. In determining the constitutionality of the textbook loan program established by Act 195, the plurality views the program in the context of the State's "well-established policy of lending textbooks free of charge to elementary and secondary school students." *Ante,* at 360 (footnote omitted). But when it comes time to consider the same Act's instructional materials and equipment program, which is not alleged to make available to private schools any materials and equipment that are not provided to public schools,[2] the majority strikes down this program because more than 75% of the nonpublic schools are church related or religiously affiliated.

If the number of sectarian schools were measured as a percentage of all schools, public and private, then no doubt the majority would conclude that the primary effect of the instructional materials and equipment program is not to advance religion.[3] One looks in vain,

---

[2] 374 F. Supp., at 644. Pa. Stat. Ann., Tit. 24, § 8-801. Instructional materials and equipment are defined in Act 195 largely in terms of materials and equipment that "are presently or hereafter provided for public school children of the Commonwealth." Act 195, § 1 (b).

[3] In 1972, "[a]pproximately one quarter of all children in the

however, for an explanation of the majority's selection of the number of private schools as the denominator in its instructional materials and equipment calculations. The only apparent explanation might be that Act 195 applies only to private schools while different legislation, Pa. Stat. Ann., Tit. 24, § 8–801, provides equipment and materials to public schools. But surely this is not a satisfactory explanation, for the plurality tells us, in connection with its discussion of the textbook loan program, which is administered to the public schools through the same statutory provision that provides equipment and materials to the public schools, that "it is of no constitutional significance whether the general program is codified in one statute or two." *Ante,* at 360 n. 8. We are left then with no explanation for the arbitrary course chosen.

The failure of the majority to justify the differing approaches to textbooks and instructional materials and equipment in the above respect is symptomatic of its failure even to attempt to distinguish the Pennsylvania textbook loan program, which the plurality upholds, from the Pennsylvania instructional materials and equipment loan program, which the majority finds unconstitutional. One might expect that the distinction lies either in the nature of the tangible items being loaned or in the manner in which the programs are operated. But the majority concedes that "the material and equipment that are the subjects of the loan—maps, charts, and laboratory equipment, for example—are 'self-polic[ing], in that starting as secular, nonideo-

Commonwealth, in compliance with the compulsory attendance provisions of this act, attend[ed] nonpublic schools." Act 195, § 1 (a). If it be assumed that the average number of students per sectarian school does not vary materially from the average number of students per nonsectarian school, then less than 19% of all students attend sectarian schools.

logical and neutral, they will not change in use.'"
*Ante,* at 365, quoting 374 F. Supp. 639, 660 (ED Pa.
1974). Nor can the fact that the school is the bailee be
regarded as constitutionally determinative. *Committee
for Public Education & Religious Liberty* v. *Nyquist,*
413 U. S., at 781. In the textbook loan program upheld
in *Allen, supra,* the private schools were responsible for
transmitting the book requests to the Board of Educa-
tion and were permitted to store the loaned books on
their premises. 392 U. S., at 244 n. 6. I fail to see how
the instructional materials and equipment program can
be distinguished in any significant respect. Under both
programs "ownership remains, at least technically, in
the State," *id.,* at 243. Once it is conceded that no
danger of diversion exists, it is difficult to articulate any
principled basis upon which to distinguish the two Act
195 programs.

The Court eschews its primary-effect analysis in strik-
ing down Act 194, *ante,* at 369, and relies instead
upon the proposition that the Act "give[s] rise to a con-
stitutionally intolerable degree of entanglement between
church and state." *Ante,* at 370. Acknowledging that
Act 194 authorizes state financing "of teachers only for
remedial and exceptional students, and not for normal
students participating in the core curriculum," *ante,* at
370, the Court nonetheless finds this case indistinguish-
able from *Lemon* v. *Kurtzman* and companion cases, 403
U. S. 602 (1971), in which salary supplement programs
for core curriculum teachers were found unconstitutional.
"[A] state-subsidized guidance counselor is surely as
likely as a state-subsidized chemistry teacher to fail on
occasion to separate religious instruction and the ad-
vancement of religious beliefs from his secular edu-
cational responsibilities." *Ante,* at 371 (footnote
omitted).

I find this portion of the Court's opinion deficient as

a matter of process and insupportable as a matter of law. The burden of proof ordinarily rests upon the plaintiff, but the Court's conclusion that the dangers presented by a state-subsidized guidance counselor are the same as those presented by a state-subsidized chemistry teacher is apparently no more than an *ex cathedra* pronouncement on the part of the Court, if one may use that term in a case such as this, since the District Court found the facts to be exactly the opposite—after consideration of stipulations of fact and an evidentiary hearing:

> "The Commonwealth, recognizing the logistical realities, provided for traveling therapists rather than traveling pupils. There is no evidence whatsoever that the presence of the therapists in the schools will involve them in the religious missions of the schools. . . . The notion that by setting foot inside a sectarian school a professional therapist or counselor will succumb to sectarianization of his or her professional work is not supported by any evidence." 374 F. Supp., at 657.

The propensity of the Court to disregard findings of fact by district courts in Establishment Clause cases, see also *Lemon* v. *Kurtzman,* 403 U. S., at 665–667 (opinion of WHITE, J.), is at variance with the established division of responsibilities between trial and appellate courts in the federal system, Fed. Rule Civ. Proc. 52 (a).

As a matter of constitutional law, the holding by the majority that this case is controlled by *Lemon* v. *Kurtzman, supra,* and companion cases marks a significant *sub silentio* extension of that 1971 decision. In those cases the Court struck down the Rhode Island salary supplement program, under which teachers employed by nonpublic schools could qualify for additional salary payments from the State in order to bring their salaries

more closely in line with the prevailing scale in public schools, and a Pennsylvania program authorizing direct reimbursement to nonpublic schools; in order to qualify, the teachers could teach only subjects that were offered in the public schools. The premise supporting the Court's conclusion that these programs "involve[d] excessive entanglement between government and religion," 403 U. S., at 614, is found at 617:

> "We cannot ignore the danger that a teacher *under religious control and discipline* poses to the separation of the religious from the purely secular aspects of precollege education. The conflict of functions inheres in the situation." (Emphasis added.)

See also *id.*, at 618. The auxiliary services program established by Act 194 differs from the programs struck down in *Lemon* in two important respects. First the opportunities for religious instruction through the auxiliary services program are greatly reduced because of the considerably more limited reach of the Act. Unlike the core curriculum instruction provided in the *Lemon* programs, "auxiliary services" are defined in Act 194 to embrace a narrower range of services:

> "'Auxiliary services' means guidance, counseling and testing services; psychological services; services for exceptional children; remedial and therapeutic services; speech and hearing services; services for the improvement of the educationally disadvantaged (such as, but not limited to, teaching English as a second language), and such other secular, neutral, nonideological services as are of benefit to nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth." Act 194, § 1 (b).

Even if the distinction between these services and core curricula is thought to be a matter of degree, the sec-

ond distinction between the programs involved in *Lemon* and Act 194 is a difference in kind. Act 194 provides that these auxiliary services shall be provided by personnel of the *public* school system.[4] Since the danger of entanglement articulated in *Lemon* flowed from the susceptibility of parochial school teachers to "religious control and discipline," I would have assumed that exorcisation of that constitutional "evil" would lead to a different constitutional result. The Court does not contend that the public school employees who would administer the auxiliary services are subject to "religious control and discipline." In fact the Court concedes that "auxiliary services personnel, because not employed by the nonpublic schools, are not directly subject to the discipline of a religious authority." *Ante,* at 371. The decision of the Court that Act 194 is unconstitutional rests ultimately upon the unsubstantiated factual proposition that "[t]he potential for impermissible fostering of religion under these circumstances, although somewhat reduced, is nonetheless present." *Ante,* at 372. "The test [of entanglement] is inescapably one of degree," *Walz* v. *Tax Comm'n,* 397 U. S. 664, 674 (1970), but if the Court is free to ignore the record, then appellees are left to wonder, with good reason, whether the possibility of meeting the entanglement test is now anything more than "a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will." *Edwards* v. *California,* 314 U. S. 160, 186 (1941) (Jackson, J., concurring).

I remain convinced of the correctness of MR. JUSTICE

---

[4] Act 194, § 1 (c) states that auxiliary services shall be provided by "each intermediate unit." The intermediate unit is a local administrative agency which oversees and assists school districts within a particular geographic area. See Pa. Stat. Ann., Tit. 24, §§ 9–951 to 9–971 (Supp. 1974–1975).

WHITE's statement in his dissenting opinion in *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S., at 814–815:

> "Positing an obligation on the State to educate its children, which every State acknowledges, it should be wholly acceptable for the State to contribute to the secular education of children going to sectarian schools rather than to insist that if parents want to provide their children with religious as well as secular education, the State will refuse to contribute anything to their secular training."

I am disturbed as much by the overtones of the Court's opinion as by its actual holding. The Court apparently believes that the Establishment Clause of the First Amendment not only mandates religious neutrality on the part of government but also requires that this Court go further and throw its weight on the side of those who believe that our society as a whole should be a purely secular one. Nothing in the First Amendment or in the cases interpreting it requires such an extreme approach to this difficult question, and "[a]ny interpretation of [the Establishment Clause] and the constitutional values it serves must also take account of the free exercise clause and the values it serves." P. Kauper, Religion and the Constitution 79 (1964). As MR. JUSTICE DOUGLAS wrote for the Court in *Zorach* v. *Clauson*, 343 U. S. 306, 313–314 (1952):

> "We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and

the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence."

Except insofar as the Court upholds the textbook loan program, I respectfully dissent.