Strafford
No. 7271

WALTER A. CALDERWOOD v. DOROTHY A. CALDERWOOD

September 30, 1975

*Sulloway, Hollis, Godfrey & Soden* and *Martin L. Gross (Mr. Gross* orally) for the plaintiff.

*Devine, Millimet, Stahl & Branch* and *Richard E. Galway, Jr. (Mr. Galway* orally) for the defendant.

## Memorandum Opinion

Following the opinion of this court in *Calderwood v. Calderwood,* 114 N.H. 651, 327 A.2d 704 (1974), the Trial Court *(Dunfey,* J.) after hearing, ordered on April 17, 1975 that the defendant's "motion for discovery is denied on the condition that Walter A. Calderwood posts the sum of $15,000.00 with the clerk of court as security for any extension of the support order in issue that may be decreed." The plaintiff was "ordered to comply . . . on or before May 16, 1975 . . . [o]therwise [the defendant's] motion for discovery shall be granted, and in such an event [the plaintiff] is ordered to comply [with discovery] on or before June 20, 1975." To this order the plaintiff excepted, moved for rehearing, and upon denial of his motion filed a bill of exceptions. Upon objection thereto by the defendant, the Trial Court *(Dunfey,* J.) entered an order on June 20, 1975, allowing the plaintiff's bill of exceptions "only on the conditions that said order of April 17, 1975 shall not be stayed pending said appeal and with the understanding that the within action is to be heard on its merits at the earliest possible date."

On July 16, 1975, the plaintiff filed in this court a "motion for stay pending appeal", asking that he "be relieved of the . . . order of June 20, 1975 insofar as it purports to impose conditions on the plaintiff's right of appeal", and that this be done by a stay of the order of April 17, 1975, denying the defendant's motion for disclosure of plaintiff's assets upon the posting by the plaintiff of $15,000 as security for any extension of the order for defendant's support.

The plaintiff's motion for stay of the superior court order of April 15, 1975, pending his appeal is denied. The order for security was a condition of the order providing for dismissal of the defendant's motion for discovery of the plaintiff's assets. The alternative of disclosure remained open to the plaintiff. The order for security was not a condition imposed upon the transfer to this court of the plaintiff's exceptions, although the requirement that the order should remain in force was such a condition of the order of June 20, 1975.

The order for security was made pursuant to the October 1974 opinion of this court that "the order for the taking of Walter's deposition should be vacated provided that he furnish security in such amount and within such time as the trial court shall determine." *Calderwood v. Calderwood,* 114 N.H. 651, 654, 327 A.2d 704, 706-07 (1974). The furnishing of security was not there stated to be

contingent upon prior entry of an order for extension of an order for support originally sought by the defendant in April 1970. *Calderwood v. Calderwood,* 112 N.H. 355, 296 A.2d 910 (1972).

Whether the order for security entered on April 17, 1975, should be stayed to permit transfer to this court of the plaintiff's exception thereto in advance of any hearing on the issue of extension of the support order rested in the discretion of the trial court. The order of June 20, 1975, that the earlier order should remain in effect was not a penalty imposed upon the excepting party but a regulation of the "statutory right of exception". *Wallace v. Wallace,* 75 N.H. 217, 219, 72 A. 1033, 1034 (1909). Merely by filing a bill of exceptions under RSA 490:10 the plaintiff did not become entitled as a matter of law to have his exceptions adjudicated in this court in advance of trial of the merits of the underlying petition. *See* RSA 490:14-a (Supp. 1973); *cf.* RSA 491:17. RSA 490:10 does not require that exceptions to interlocutory rulings and directions of the superior court be transferred in advance of final disposition of the principal action. *See State v. Cote,* 95 N.H. 248, 252, 61 A.2d 710, 713 (1948); *cf. Bagley v. Small,* 92 N.H. 107, 26 A.2d 23 (1942). The filing of the bill of exceptions, with a request for transcription of the record, did not deprive the trial court of its jurisdiction to determine "the manner and timing of the trial". *Jamestown Mut. Ins. Co. v. Meehan,* 113 N.H. 639, 641, 312 A.2d 689, 691 (1973); *see* 4 N.H. Judicial Council Rep. 33, 34 (1952). We find no occasion to exercise the supervisory power of the court.

*Motion for stay pending appeal denied.*

GRIMES and GRIFFITH, JJ., did not sit.

Request of Governor and Council
No. 7296

OPINION OF THE JUSTICES

September 30, 1975

The following resolution was adopted by the Governor and Council on August 26, 1975, and filed with the supreme court on August 27, 1975:

"WHEREAS, the United States Supreme Court decided on May 15, 1975 the case of *Meek & a. v. Pittenger & a.,* 44 L. Ed. 2d 217 (1975) on the subject of state aid to parochial school children; and

"WHEREAS, the General Court provided in a footnote to 1975 Laws 505 (at p. 171), effective July 1, 1975, that '[n]ot-

withstanding the provisions of RSA 189:49, 198:22, . . . the state board of education shall have discretionary authority with regard to payments under the provision of said statutes in order to comply with the recent U.S. Supreme Court decision (Meer [*sic*] case)'; and

"WHEREAS, the State Board of Education promulgated effective July 16, 1975 certain guidelines, upon which school districts may now rely, governing the compensable provision of those child benefit services to be provided pursuant to RSA 189:49 (supp. 1973) and RSA 198:22 (supp. 1973); and

"WHEREAS, the Governor and Executive Council must approve the expenditure of funds under the said guidelines pursuant to N.H. Constit., Pt. II, Art. 56 and RSA 4:15; and

"WHEREAS, the Governor and Executive Council consider that it may be necessary to call together the General Court pursuant to N.H. Constit., Pt. II, Art. 50, depending upon the response to this request; and

"WHEREAS, these circumstances constitute a solemn occasion in which certain important questions of law arise;

"NOW THEREFORE, BE IT RESOLVED

"That the Justices of the Supreme Court be respectfully requested to give their opinion on the following important questions of law:

"1. Are payments made in conformance with the State Board of Education guidelines, RSA 189:49 (supp. 1973), and RSA 198:22 (supp. 1973) constitutionally permissible in light of *Meek & a. v. Pittinger & a.,* 44 L. Ed. 2d 217 (1975)?

"2. Do the restrictions imposed by the guidelines upon the provision of those child benefit services contemplated by RSA 189:49 (supp. 1973) and RSA 198:22 (supp. 1973) reach beyond that measure of discretion granted the State Board of Education by 1975 Laws 505 in order to comply with *Meek & a. v. Pittenger & a.,* 44 L. Ed. 2d 217 (1975)?

"AND BE IT FURTHER RESOLVED

"That the Secretary of State be directed to transmit ten attested copies of this resolution to the Clerk of the Supreme Court, and that he include with each copy an attested copy of the guidelines adopted by the State Board of Education July 16, 1975."

The following answer was returned:

*To His Excellency the Governor and the Honorable Council:*

The undersigned justices of the supreme court return the following answer to the questions contained in your resolution adopted August 26, 1975, and filed in this court on August 27, 1975.

Your first question is as follows:

"Are payments made in conformance with the State Board of Education guidelines, RSA 189:49 (supp. 1973), and RSA 198:22 (supp. 1973) constitutionally permissible in light of *Meek & a. v. Pittenger & a.*, 44 L. Ed. 2d 217 (1975)?"

In *Meek v. Pittenger*, 421 U.S. 349 (1975), the Supreme Court upheld a provision of a Pennsylvania statute which provided for the loan, free of charge, of textbooks which are acceptable for use in any public school, directly to children attending nonpublic schools that met Pennsylvania's compulsory attendance requirements. The textbook loan program was available to all schoolchildren, those in public as well as nonpublic schools. The Court struck down however as constituting an impermissible establishment of religion and as creating a serious potential for excessive entanglement both political and administrative, provisions which would provide "auxiliary services" including counseling, testing, psychological services, speech and hearing therapy and related services for exceptional, remedial or educationally disadvantaged students and such other secular, neutral, nonideological services as are of benefit to nonpublic schoolchildren and are provided for those in public schools. Struck down also was the provision for loans directly to nonpublic schools of instructional materials and equipment including periodicals, photographs, maps, charts, recordings and films and projectors, recorders and laboratory equipment. Under the auxiliary services provision of the statute considered in *Meek*, the teaching and services were to be provided in the nonpublic schools themselves and only at their request, although by personnel employed by the public school district.

The Court held that given the fact that religion was an integral part of the dominant mission of the school "in which an atmosphere dedicated to the advancement of religious belief is constantly maintained" the potential for both political

and administrative entanglement existed. As to the instructional materials and equipment to be loaned directly to the nonpublic schools, the Court said that although the materials and equipment were "self-polic[ing] in that starting as secular, nonideological and neutral they will not change in use"; nevertheless, the substantial amount of direct support authorized when flowing to schools " 'in which religion is so pervasive that a substantial portion of their functions are subsumed in the religious mission', state aid has the impermissible primary effect of advancing religion." *Meek v. Pittenger supra.*

We have no need to consider whether the nonpublic schools which are involved in New Hampshire are of the type referred to in the *Meek* case for we are of the opinion that the guidelines laid down by the State board of education avoid the proscriptions of that case.

The auxiliary services authorized by our statutes, RSA 189:49 (Supp. 1973) and RSA 198:22 (Supp. 1973), may be divided into three groups. The first includes physician services, school nurse services, school health services, textbooks loaned to the students, and hot lunches. Second, school guidance and psychological services, educational testing services, health and welfare services, driver education, special programs for the deaf, blind, emotionally disturbed, crippled and physically handicapped and physical education, and third, instructional materials incidental and necessary to provide the services in group two and educational television services limited to only study guides for students on an individual basis which adhere to the same limitations as are imposed on textbooks.

In group one, the provisions by which textbooks are provided directly to students appear to be indistinguishable from those which were upheld as constitutional in *Meek*. The other services included in group one such as physician, nurse and health services and hot lunches although apparently to be furnished to students within the nonpublic schools themselves are nevertheless so unrelated to the educational programs of those schools, being strictly nonideological, and incapable of being used to promote an ideology, that there is no danger that they will be used to foster religion. There will be no need for continuing surveillance so as to lead to excessive entanglement either political or administrative.

All such services are provided upon request of the non-public school student, rather than upon request of the non-public school itself.

The services in group two are of the same nature as those struck down in *Meek*. However, the fact that those services are to be furnished directly to the children at places removed from the nonpublic schools by personnel employed by the school district and at the request of the student rather than the nonpublic school removes the "potential for impermissible fostering of religion" *(Meek v. Pittenger supra)* and eliminates the need for continuing surveillance which would lead to either political or administrative entanglement. Consequently the services in this group are not prohibited by *Meek*.

The instructional materials furnished under group three are confined to use in connection with the services provided in group two. Since these services are not performed in the nonpublic schools but at other places, the aid does not flow to the nonpublic schools but directly to the students. The dangers which led the court to strike down the Pennsylvania statute involved in the *Meek* case are thus avoided. The educational television services although not confined to places outside the nonpublic schools are limited to the expense of study guides furnished for the individual use of the students on the same basis as textbooks. This does not appear to be proscribed by the *Meek* decision.

Therefore the answer to question one is "Yes".

Question two is as follows:

"Do the restrictions imposed by the guidelines upon the provision of those child benefit services contemplated by RSA 189:49 (supp. 1973) and RSA 198:22 (supp. 1973) reach beyond that measure of discretion granted the State Board of Education by 1975 Laws 505 in order to comply with *Meek & a. v. Pittenger & a.*, 44 L. Ed. 2d 217 (1975)?"

The footnote to Laws 1975, ch. 505 provides in part "and the state board shall have discretionary authority with regard to payments under the provisions of said statute in order to comply with the U.S. Supreme Court decision (Meek Case)." *See also* RSA 193:1-b (Supp. 1973).

The Roman Catholic Bishop of Manchester, a corporation sole, in its memorandum claims that the State board has

exceeded its discretion in two areas: (1) in eliminating educational television services and (2) in confining instructional materials to those not consumable in initial use and not "all purpose" and by further limiting them to those necessary to the services that are provided outside the nonpublic schools.

We do not read the guidelines as eliminating educational television services. Guideline C 3-b limits the expense for this service to study guides for students described under "textbooks" under section C 1-d which in turn provides that such guides qualify as textbooks when made available for the individual use of the student. This appears to be required by *Meek* to avoid furnishing the guides directly to the nonpublic schools. This provision presupposes that there will be educational television services provided.

The Catholic Bishop of Manchester appears to be concerned that the guidelines, by limiting the expense to study guides prevents payment to the educational television network of a one dollar a year per pupil fee. If the guideline is intended to eliminate the payment of the per pupil fee to the network, the State board has exceeded its discretion by going beyond what is required by *Meek*. The legislative intent appears to have been to provide the maximum services permissible under the *Meek* case.

As to the instructional materials which are limited by the guidelines to services provided outside the nonpublic schools, the Catholic Bishop of Manchester contends that the Pennsylvania provision for such materials was struck down in *Meek* because they were loaned directly to the nonpublic schools. It contends that it is therefore permissible to furnish such materials for services provided in the nonpublic schools provided the materials are furnished directly to the students instead of to the schools.

We do not have sufficient information to permit us to decide whether the instructional materials referred to are used by the teacher in instructing or by the students in the same manner as textbooks. It would appear to us that those materials which are used by the students in a manner similar to the way they use textbooks could be supplied directly to them and not offend the rulings of the *Meek* case. However, it is difficult for us to see how instructional materials which are intended to be used by the teachers could be loaned to

the students. We are unable to advise at this time whether by limiting the instructional materials to the services performed outside the nonpublic schools the board exceeded the discretion granted to it.

In all other respects, the answer to question two is "No".

FRANK R. KENISON
LAURENCE I. DUNCAN
EDWARD J. LAMPRON
WILLIAM A. GRIMES
ROBERT F. GRIFFITH

*Warren B. Rudman,* attorney general, and *John S. Kitchen,* attorney, filed a memorandum of law.

Roman Catholic Bishop of Manchester, by *Burns, Bryant, Hinchey, Cox & Shea,* filed a memorandum of law.