GRENDEL'S DEN, INC., Plaintiff,
Appellee,

v.

Herbert N. GOODWIN et al.,
Defendants, Appellees.

Cambridge License Commission et al.,
Defendants, Appellants.

GRENDEL'S DEN, INC., Plaintiff,
Appellee,

v.

Herbert N. GOODWIN et al.,
Defendants, Appellants.

Nos. 80–1653, 80–1654.

United States Court of Appeals,
First Circuit.

Argued Nov. 3, 1980.

Decided April 7, 1981.

Gerald J. Caruso, Asst. Atty. Gen., and Birge Albright, Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Thomas Miller, Asst. Atty. Gen., Boston, Mass., were on brief, for defendants, appellants.

Laurence H. Tribe, Cambridge, Mass., with whom David Rosenberg, Cambridge, Mass., and Ira Karasick, New York City, were on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and HOFFMAN,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Grendel's Den is a restaurant which plaintiff-appellee Grendel's Den, Inc. has operated since 1971 in Harvard Square, Cambridge, Massachusetts. Grendel's and the Holy Cross Armenian Catholic Parish Church occupy buildings that are about ten feet apart. Located back to back on premises that share a common rear property line, both buildings are near a busy motor and pedestrian intersection.

On May 13, 1977, Scorpio's, Inc., a holder of an All Alcoholic Restaurant License, applied to defendant-appellant Cambridge License Commission (CLC) for approval to transfer its license to Grendel's pursuant to a purchase arrangement with the latter. In conformity with state law, notice of the transfer application was published in a local newspaper and mailed to all abutting property owners and to all schools, hospitals, and churches within a 500 foot radius of Grendel's, including the Holy Cross Church. Mass.G.L. c. 138, § 15A. On May 25, 1977, Holy Cross notified the CLC of its objection to the license transfer.[1]

Mass.G.L. c. 138, § 16C provides, in part: "Premises, except those of an innholder and except such parts of buildings as are located ten or more floors above street level, located within a radius of five hundred feet of a church or school shall not be licensed for the sale of alcoholic beverages if the governing body of such church or school files written objection thereto. . . ."[2]

On May 31, 1977, the CLC denied the application for the transfer to Grendel's of Scorpio's license, citing Holy Cross's objection. Grendel's and Scorpio's appealed the CLC's decision to the Massachusetts Alcoholic Beverages Control Commission (MABCC), which on September 8, 1977, following a hearing, sustained the action of the CLC. MABCC noted that "the church's objection under Section 16C was the only basis on which the transfer was denied."

On November 7, 1977, Grendel's instituted this action in the district court against MABCC, CLC and their individual mem-

---

* Of the Eastern District of Virginia, sitting by designation.

1. The objection was in the form of a letter written by Holy Cross's Pastor, which read, in part:

"The Council of the Holy Cross Church and the parishioners unanimously rejected in the past and again in the present, the idea of having so many liquor licenses *so* near to our Church.

"We already have plenty of noise, dirt, and abuse from Grendel's Den, Inc.

"We are kindly asking the Commission to reject the above License. Holy Cross Church Council and myself—Pastor of Holy Cross Church personally—*object* to the transfer of any liquor license to Grendel's Den, Inc."

2. "Church" is defined, in section 16C, as "a church or synagogue building dedicated to divine worship and in regular use for that purpose, but not a chapel occupying a minor portion of a building primarily devoted to other uses. . . ." It is not disputed that Holy Cross is a "church" within the meaning of the section.

bers, alleging that section 16C "on its face and as applied" was unconstitutional and violated the Sherman Act. Shortly thereafter, the parties agreed to suspend further proceedings in the case pending the decision of the Massachusetts Supreme Judicial Court in *Arno v. Alcoholic Beverages Control Commission,* 377 Mass. 83, 384 N.E.2d 1223 (1979), which upheld section 16C against state and federal constitutional attack. After the *Arno* decision was rendered, each party moved for summary judgment on the issues of the statute's facial constitutionality and the applicability of the "state action exemption" to Sherman Act liability.[3] On August 14, 1980, the district court held that section 16C violated the due process clause of the fourteenth amendment and the establishment clause of the first amendment (as applied to the states through the fourteenth amendment); on September 5, 1980, the court entered judgment in favor of plaintiff on these constitutional claims. The district court also denied defendants' motion to dismiss the Sherman Act claim on grounds of state action immunity; the denial of the motion is before us on appeal pursuant to 28 U.S.C. § 1292(b).

I.

Section 16C in its current form is essentially the third version of a provision first enacted in 1954. The first version, inserted by Mass.St.1954, c. 569, § 1, was a categorical ban on the licensing of premises (other than those of an innholder) located within 500 feet of a church or school. A 1968 amendment permitted licensed premises within the 500 foot radius "if the governing body of such church or school assents in writing." Finally, Mass.St.1970, c. 192, § 1, substituted the present language, prohibiting licensing within the 500 foot zone "if the governing body of such church or school files written objection thereto...." *See Arno, supra,* 377 Mass. at 88, 384 N.E.2d at 1226–27.

In evaluating section 16C, the district court proceeded from the premise that the first version of the law was plainly valid: "It is well established that a state, acting under the power granted by the Twenty-first Amendment, may constitutionally ban the sale of liquor within a specified radius of a church." 495 F.Supp. at 763. The court nevertheless believed that the current version of section 16C contravened guarantees of due process by effectuating an improper delegation of legislative power to private entities. In so holding, the district court relied on three Supreme Court cases dealing with the delegation of legislative authority.[4]

In *Eubank v. Richmond,* 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912), the Court

---

3. The parties have notified us that proceedings on Grendel's "as applied" constitutional claims, as well as the merits of Grendel's Sherman Act challenge, "were reserved and postponed." It is not clear in what manner Grendel's "as applied" claims differ from the constitutionally based arguments made before us in this appeal. To the extent these claims are no longer viable in light of this opinion, we would expect them to be summarily dismissed.

4. Grendel's contends that the operation of section 16C has deprived it of "liberty, or property, without due process of law." U.S.Const. amend. XIV, § 1. We observe at the outset that it is by no means clear precisely how, if at all, the due process clause serves to constrain a state's procedure for granting limited numbers of privileges to conduct a highly regulated enterprise. Surely Grendel's has no "entitlement" to a liquor license such as would implicate a property interest; nor does an application for a liquor license involve a "fundamen-

tal" or "natural" right—such as the right to earn a living, engage in one's chosen profession, or even to engage in activities generally available to citizens on equal terms with others—that might be characterized as a protected "liberty" interest. *See Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Medina v. Rudman,* 545 F.2d 244 (1st Cir. 1976), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977); *Raper v. Lucey,* 488 F.2d 748 (1st Cir. 1973). Grendel's "due process" argument, however, is replete with implications that the Commonwealth's mechanism for granting liquor licenses involves arbitrariness, discrimination, and corruption. Since we assume that, at some point, government arbitrariness or misconduct in the granting of liquor licenses might constitute a due process violation, we proceed to examine Grendel's due process claim.

invalidated a city ordinance that empowered owners of two-thirds of the property abutting on any street to establish, within a specified range, a building set-back line for that street. Fines were imposed on persons constructing new buildings that did not respect the set-back line thus established. The Court considered "the question in the case" to be whether the ordinance was "a valid exercise of the police power." *Id.*, at 142, 33 S.Ct. at 76. It concluded that, because private property owners were given the power to control the use of property owned by others, thus giving rise to a zoning plan with little consistency from block to block, the ordinance was not a reasonable exercise of police power such as would support restrictions on land use:

"One set of owners determine not only the extent of use but the kind of use which another set of owners may make of their property. In what way is the public safety, convenience or welfare served by conferring such power?"

*Id.*, at 143, 33 S.Ct. at 77.

Five years later, however, in *Thomas Cusack Co. v. Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917), the Court upheld a city ordinance that prohibited the construction of billboards in residential areas without the consent of the owners of a majority of frontage property on the block in which the billboard was to be erected. The ordinance was within the city's police power because regulation of billboards had been shown to be "in the interest of the safety, morality, health and decency of the community." *Id.*, at 530, 37 S.Ct. at 191. The Court labelled "palpably frivolous" the claim that the ordinance's validity was impaired by the provision permitting modification of the billboard prohibition upon the consent of private property owners:

"The plaintiff in error cannot be injured, but obviously may be benefited by this provision, for without it the prohibition of the erection of such billboards in such residence sections is absolute. He who is not injured by the operation of the law or ordinance cannot be said to be deprived by it of either constitutional right or of property."

*Id.*, at 530, 37 S.Ct. at 191.

The last of the three cases, *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), concerned a comprehensive zoning ordinance which included among the permitted uses in a certain residential district "a philanthropic home for children or for old people ... when the written consent shall have been obtained of the owners of two-thirds of the property within four hundred feet of the proposed building." Reiterating that zoning restrictions interfering "with the general rights of the land owner by restricting the character of his use ... cannot be imposed if [they do] not bear a substantial relation to the public health, safety, morals, or general welfare," *id.*, at 121, 49 S.Ct. at 51, the Court held that the ordinance exceeded the city's police powers:

"The facts disclosed by the record make it clear that the exclusion of the new home from the first district is not indispensable to the general zoning plan. And there is no legislative determination that the proposed building and use would be inconsistent with public health, safety, morals or general welfare. The enactment itself plainly implies the contrary. The grant of permission for such building and use, although purporting to be subject to such consents, shows that the legislative body found that the construction and maintenance of the new home was in harmony with the public interest and with the general scope and plan of the zoning ordinance."

*Id.*, at 121, 49 S.Ct. at 51.[5]

█ A primary concern expressed by the Court in the above cases was the relation of

---

**5.** The zoning ordinance in *Roberge* allowed in the district in question, besides single family dwellings, various institutional uses such as schools, fraternity, sorority and boarding houses, and a clubhouse or memorial building.

None of these uses required prior approval by nearby landowners. The "philanthropic home for aged poor," on which the dispute centered, was "an attractive, two and a half story fireproof house large enough to be a home for 30

the contested ordinances to matters properly the subject of state or municipal regulation under the "police power." Only in *Cusack*, where the facts were sufficient to warrant the conclusion that the billboards "would or were liable to endanger the safety and decency" of residential neighborhoods, *Roberge*, 278 U.S. at 122, 49 S.Ct. at 52, was such a relation found; in that situation, the consent of those who might otherwise be harmed by the questionable use could lawfully be required. In the instant case, the power of the state under the twenty-first amendment to regulate the dispensation of liquor is both unquestioned and broad. *See California v. LaRue*, 409 U.S. 109, 115, 93 S.Ct. 390, 395, 34 L.Ed.2d 342 (1972); *Ziffrin v. Reeves*, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939). Clearly it can be said even more emphatically than was said of the restrictions on billboards in *Cusack* that the restrictions on liquor licensing involved here are properly within the state's regulatory power. Likewise, if, as the Court's analysis in *Roberge* suggests, important distinctions are to be drawn between uses that are potential nuisances or, at least, annoyances to the community and those that are not, *see also Village of Belle Terre v. Boraas*, 416 U.S. 1, 7, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974), the present case is analogous to *Cusack* rather than to *Eubank* or *Roberge*.[6]

■ A general principle to be gleaned from *Eubank, Cusack,* and *Roberge* is that

---

persons." 278 U.S. at 117, 49 S.Ct. at 50. This structure, the Court said, would be mostly hidden by trees and shrubs, would cover only four percent of the tract, and would be at least 110 feet from the nearest building. The foregoing factors were relevant to the Court's conclusion that, unlike the billboards in *Cusack, supra*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 the proposed new home would not be "a nuisance" or "work any injury, inconvenience or annoyance to the community, the district or any person." 278 U.S. at 122, 49 S.Ct. at 52. *See also Village of Belle Terre v. Boraas*, 416 U.S. 1, 7, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974). The Court even included what might be construed as an expression of its doubt that the exclusion of philanthropic homes, a use not "by reason of [its] nature . . . liable to be offensive," 278 U.S. at 122, 49 S.Ct. at 52, would be valid even absent a delegation of power:

> "We need not decide whether, consistently with the Fourteenth Amendment, it is within the power of the State or municipality by a general zoning law to exclude the proposed new home from a district defined as is the first district in the ordinance under consideration."

*Id.*, at 123, 49 S.Ct. at 52.

**6.** It may be significant that *Eubank* and *Roberge* were cases involving zoning ordinances and decided during a period when "[t]he line which in [the] field [of regulatory zoning] separate[d] the legitimate from the illegitimate assumption of power [was] not capable of precise delimitation." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 359, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In fact, at the time *Eubank* was decided there was a significant question whether a municipality had *any* power to establish building set-back lines. *Gorieb v. Fox*, 274 U.S. 603, 609–10, 47 S.Ct. 675, 677–78, 71 L.Ed. 1228 (1927). Likewise, as already noted, the *Roberge* Court seemed at least as concerned with the fact that philanthropic homes had not been shown to be either offensive or inconsistent with the uses permitted in the district as it was with the fact that private parties had some participation in making zoning decisions, and seemed to call into question whether philanthropic homes could be prohibited in such a district at all. *See* note 5, *supra*. Indeed, ten years after *Roberge* was decided, the Court distinguished it as a "case . . . where a prohibition of an *inoffensive* and *legitimate* use of property [was] imposed not by the legislature but by other property owners . . . ," (emphasis added), *Currin v. Wallace*, 306 U.S. 1, 15–16, 59 S.Ct. 379, 386–87, 83 L.Ed. 441 (1939) (upholding a provision making federal regulation of tobacco auctions applicable only in markets where two-thirds of growers favored regulation). In another case, the Court described *Eubank* and *Roberge* as concerning instances where the "property affected had been acquired without any preexisting restriction in respect of its use or disposition" and "the imposition of the restriction *in invitum* was authorized after complete and unrestricted ownership had vested in the persons affected." *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*, 299 U.S. 183, 194, 57 S.Ct. 139, 144, 81 L.Ed. 109 (1936).

In this case there is no question that the contested provision deals with subject matter—public distribution of liquor—that is at the heart of the state's regulatory power and concerns a use not presumptively "legitimate" and "inoffensive." There is similarly no expectation that private property owners may without restriction convert their properties into taverns; the expectation is quite the opposite, *i. e.*, that one is not entitled to sell liquor until one obtains a state license to do so.

legislative bodies may not abrogate their responsibility to formulate and impose policy regarding matters such as zoning or the issuance of governmental privileges, by delegating this responsibility to private parties "uncontrolled by any standard or rule prescribed by legislative action. . . ." *Roberge, supra*, 278 U.S. at 122, 49 S.Ct. at 52. When, however, a legislative body has decided, in valid exercise of its powers, that it is necessary to restrict a use manifestly subject to regulation, the problem of an abdication of legislative responsibility lessens and it may then be appropriate to condition the imposition of such restrictions upon lack of consent to the potentially offending use by the parties that the regulation seeks to protect. *Cusack*, 242 U.S. at 531, 37 S.Ct. at 192; *see also Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 677–78 n.12, 96 S.Ct. 2358, 2364 n.12, 49 L.Ed.2d 132 (1976); *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 109, 99 S.Ct. 403, 412, 58 L.Ed.2d 361 (1978). Unlike the district court, we do not construe the above cases to mandate that this mitigating consent be ascertained in only one particular form—that modification of a prohibition upon an affirmative expression of "consent" is valid, whereas modification of the same prohibition upon a "lack of objection" is constitutionally impermissible. Such a distinction would be both artificial and illogical. Rather, the determinative question is whether the "consent" or "lack of objection" of private parties goes only toward the modification of restrictions that have already been validly framed by representative bodies and that reflect a clear expression of governmental policy.

The district court concluded that the 1968 amendment to section 16C, permitting licensing upon the consent of churches and schools in the prescribed area, was valid because it simply incorporated a legislative policy subject to waiver. The court found the current version defective, however, because it "actually licenses private persons to *impose* policy on the public." 495 F.Supp. at 764 (emphasis in original). The 1970 amendment to section 16C was said to have "actually reversed the underlying policy of

the statute" so that the legislation was now "neutral" on the question of whether to license establishments in the vicinity of churches and schools. Due to this "substantive change in legislative policy," decision-making in the field had been "effectively delegated . . . to private entities."

We find this assessment of the change effected by the 1970 amendment to be unconvincing. It is far-fetched to suggest that Massachusetts has abandoned its previous concern with providing churches and schools some protection from liquor-serving establishments. We think the underlying policy of the Massachusetts legislature after the 1970 amendment remains much the same as it was before—the legislature continues to doubt, as it always did, the compatibility of licensed establishments operating within 500 feet of a church or school, but now deems it reasonable that the church or school—which, after all, is in the best position to know how the establishment will affect its operations—confirm that it will not waive the protection provided. In *Arno, supra*, the Supreme Judicial Court examined the three versions of section 16C and concluded:

> "The history of the statute demonstrates a progressive relaxation of licensing limitations against a backdrop of a legislative option of total prohibition. While seeking in part to facilitate the granting of licenses, the Legislature chose also to preserve, where appropriate, its legitimate police power objective of providing a zone of protection.
>
> .    .    .    .    .
>
> The current provision does not invest the church with a new, expanded power to legislate a prohibition. It merely shifts to the church the burden of objecting, while retaining the essential legislative mandate that no license be granted within the protected area in the face of a nonconsenting church."

377 Mass. at 88–90, 384 N.E.2d at 1227–28. We see no reason to disagree with this perfectly reasonable and common-sense analysis.

■ Massachusetts has formulated a general prohibition on the sale of intoxicating liquor within 500 feet of a church or school. It has also exercised the constitutionally permissible option of conditioning this prohibition on the lack of consent of churches and schools within the prescribed area. Finally, it has adopted the procedural expedient of requiring churches and schools, upon notice of a pending license application, to express their lack of consent rather than placing the burden on license applicants to procure the affirmative consent of these institutions.[7] Such a legislative scheme is not repugnant to the due process clause.

To be sure, such a scheme of regulation has the potential for producing results that, viewed as a whole under an objective standard, may not seem entirely consistent. The same might be said of any system that provides for individual variances from a set of general restrictions. Grendel's complains that there are presently 26 licensed establishments within a 500-foot radius of the Holy Cross Church and that the Church has failed to object to issuance of at least 14 of these licenses. In addition, Grendel's complaint states that "despite the fact that the Grendel's Den entrance is closer to the entrance of the University Lutheran Church than to the [Holy Cross] Parish entrance, the University Lutheran Church has never interposed an objection to plaintiff's acquiring a license."

This situation reflects little more than the fact that Massachusetts has attempted to closely calibrate its regulation to the individualized needs of protected institutions, by permitting each institution to make assessments of pending license applications—assessments that may take into account such factors as the perceived offensiveness to the institution of public liquor consumption in its vicinity and the threatening nature of a prospective licensee. Thus, while Massachusetts has adopted a legislative policy that prefers the interests of schools and churches over those of liquor-serving establishments, it has also made a concession to license applicants by permitting licensing when the affected churches and schools conclude that they will not be injured thereby. It is not shocking that the Holy Cross Church has, in the past, found unobjectionable the licensing of 14 establishments within the 500-foot radius. Earlier managers of the church may have had a more optimistic view of the operation of such establishments. The growing numbers of such places may be seen as causing a problem. Located in the midst of a congested business area, the Church may be unconcerned about more remote licensed establishments although it finds disturbing the prospect of licensed premises ten feet away; the Church may also find important the nature of the establishment seeking a license or the conscientiousness of the prospective license holder. Likewise, it is not surprising that of two churches closely situated one might find issuance of a license disturbing while the other does not; a vir-

---

7. Mass.G.L. c. 138, § 15A requires each applicant to provide churches with notice of the pending license application and, since 1970, to "indicate the necessity of a written objection to prevent the issuance and transfer of such license under the provisions of section 16C." Thus, both before and after the 1970 amendments to c. 138, license applicants who sought to operate within 500 feet of a church were required to approach the church for its "consent," the only difference being that after 1970 the church, having been notified of the pending license application and of the necessity of an objection to prevent the license from issuing, is presumed to "consent" if it tenders no response. The most obvious reason for the legislature to replace the requirement that all churches or schools within 500 feet give their "consent" with a provision permitting licenses to issue if there is no objection, is to protect potential licensees against churches and schools that, either for lack of interest of their perhaps unwieldy governing boards or because of concern of some members over taking a "pro-liquor" stance, might simply neglect to furnish their consent even though having no real objection. Thus a church 450 feet distant from an establishment from which it feared no adverse consequences might withhold formal consent even though it would never register any objection. It seems the ultimate in irony that a legislative amendment designed to "fine tune" the statute and render it more workable for all interests should become the basis for arguing that the legislature no longer has a coherent general policy that licensed establishments are likely incompatible with schools and churches.

tue of section 16C is that it accommodates the differing concerns of different congregations.

Grendel's position is that the state may take into account the individualized concerns of churches and schools but that it must place the final decision whether to grant a license in the discretion of a government agency. If the particular needs of the protected institutions are truly to be determinative, however, we fail to see how this additional layer of bureaucracy would enhance either "due process" or the interests of the parties involved. For example, to give adequate weight to Holy Cross's concern with "having so many liquor licenses *so* near to our Church," the CLC would have had to have given full effect to the Church's objection, at least absent a showing that the objection was made in bad faith or for some invidious reason—a showing which has not been made in this case. Had the CLC undertaken to inquire whether a "reasonable church" would find Grendel's service of liquor objectionable, it would have undermined the legislature's intent that each institution's assessment of what is disturbing be taken into account. Had the CLC chosen to hold against the Church the fact that the Church had permitted licenses to issue to others in the area, it would be in effect encouraging institutions to object in bad faith in order to preserve the right to later make a good faith objection. Had the CLC found the existence of the 26 other licensed premises to be dispositive, it would have overlooked the fact that section 16C provides for variances from a general prohibition; under such a system, the existence of "nonconforming uses" cannot be said to vitiate the force of the overall restriction. Finally, had the CLC been in reality bound to give effect to the Church's objection, although cloaked with authority to make an independent decision, we do not think this would have "sanitized" those aspects of the licensing scheme said to run afoul of the due process clause.

We conclude that section 16C is a reasonable means of regulation in an area where states have wide latitude to regulate, and not dissimilar to schemes commonly used in the fields of licensing and zoning. *See, e. g., O'Brien v. St. Paul,* 285 Minn. 378, 173 N.W.2d 462 (1969); *Robwood Advertising Associates v. Nashua,* 102 N.H. 215, 153 A.2d 787 (1959) and cases cited therein. It does not violate the due process clause.

## II.

◼ A legislative enactment does not contravene the establishment clause of the first amendment if (1) it has a secular legislative purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive government entanglement with religion. *Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The district court found that section 16C served "the valid secular legislative purpose of protecting spiritual, cultural, and educational centers from the 'hurly-burly' associated with liquor outlets" and noted that "Grendel's concedes that such a purpose satisfies the first part of the test." 495 F.Supp. at 766–67. We agree that section 16C serves this secular purpose, and would add that, aside from insulating churches and schools from whatever noise and disruption may accompany liquor-serving establishments, section 16C serves to shield from public liquor consumption those institutions with which such a use might be deemed most incompatible or whose members might be most offended by the use. *See Arno, supra,* 377 Mass. at 87, 384 N.E.2d at 1226; *cf. Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974) ("The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people."); *Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed.2d 27 (1954) ("The

concept of the public welfare is broad and inclusive.... The values it represents are spiritual as well as physical, aesthetic as well as monetary.")

Grendel's contends, however, that section 16C has a principal effect of advancing religion and fosters excessive government entanglement with religion. We think the questions of an improper primary effect and excessive entanglement must be analyzed in two parts:

(1) Whether it is constitutionally impermissible under the establishment clause for a state to provide a "zone of protection" from liquor licensing within the vicinity of churches and schools.

(2) If not, whether such a zone of protection becomes invalid when individual churches and schools are "delegated" the decision to object or not object to licensing within the designated zone.

■ Turning to the first part of this analysis, we conclude that, while a liquor-free zone around churches and schools unquestionably provides a "benefit" to religious institutions, among others, it does not have a "primary effect of advancing religion" as that phrase has been used in Supreme Court precedent. *See, e. g., Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (tuition reimbursement to parents of children attending parochial school); *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (subsidy for parochial school teachers' salaries). *Compare Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (upholding exemption of church property and activity from taxation); *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (validating arrangement whereby students released from public school to attend religious instruction). *See also Tilton v. Richardson*, 403 U.S. 672, 679, 91 S.Ct. 2091, 2096, 29 L.Ed.2d 790 (1971) ("The crucial question is not whether some benefit accrues to a religious institution as a consequence of the legislative program but whether its principal or primary effect advances religion.") The ban on licensing may enhance the at-

mosphere of peace and tranquility in the vicinity of churches, much as the Sunday "Blue Laws" upheld in *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), helped create a tranquil atmosphere conducive to worship. Moreover, those sects that find the service of liquor repugnant to their religious beliefs will no doubt have their enjoyment of worship heightened by the knowledge that there are no liquor-serving establishments in their own backyard. However, even if these effects are seen to be "primary" and "direct," rather than incidental by-products of the Massachusetts licensing scheme, they do not go further than to provide surroundings accommodating to the free exercise of religion. Churches are not given economic aid, nor are government facilities used for religious purposes. No sect is preferred over another, nor are persons coerced to attend church. There is no state sponsorship of religion. Churches are merely placed in the category of schools and similar types of institutions, whose activities cannot so readily coexist with potentially noisy and troublesome neighbors. The Supreme Court has never held that the state must refrain from all actions that foster an environment favorable to worship. *Cf. Zorach v. Clauson*, 343 U.S. 306, 313–14, 72 S.Ct. 679, 683–84, 96 L.Ed. 954 (1952) ("We are a religious people whose institutions presuppose a Supreme Being.... When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs it follows the best of our traditions.") While religion can make no claim to special favor, it may request that its special needs be accommodated in ways similar to those of other cherished institutions.

The proper balance to be struck in crowded urban areas between places of conviviality and entertainment, and places like churches and schools which prefer a different environment, would seem best left to the legislature, which reflects the interests of the whole community. Here the legislature has sought to accommodate churches and schools in a certain manner. Recent

legislative changes, favorable to the liquor license owners, indicate that both sides continue to have input in the legislative process. In a case such as this, where the primary evils to which the establishment clause was addressed are not at stake, it seems to us no gain to replace this democratic process, in which the diverse voices of our society are heard, by the fiat of a handful of judges. It may indeed portend a loss to do so if courts constitutionalize privately held values so as to override the social consensus.

Grendel's argues that a liquor-free zone presents constitutional problems if its protection extends only to churches and schools (of which some percentage are parochial schools). These institutions, "a substantial proportion of which are religious in nature," are said to constitute only "a narrow category" of the social institutions that might benefit from a licensing ban. We think, however, that the Massachusetts legislature could rationally decide that schools and churches were institutions in need of special protection.[8] It bears repeating that states have broad latitude under the twenty-first amendment to control the manner in which liquor is dispensed. It does not violate the establishment clause for a state to choose, in exercising this power, to refrain from granting licensing privileges in areas where, *in the judgment of the legislature,* such privileges might seriously interfere with the operations of valued institutions. *Cf. California v. LaRue,* 409 U.S. 109, 119–20, 93 S.Ct. 390, 397–98, 34 L.Ed.2d 342 (1972) (Stewart, J., concurring; suggestion that twenty-first amendment enables states to provide that "liquor shall not be sold ... within 200 feet of a church").

The dissent raises the further spectre that the definition of "church" might be read so as not to include "Buddhism, Confucianism, or transcendentalism." The dissent further contends that "whether a mosque, marabout, pagoda, or tope would qualify [under section 16C] is an open question." There is no reason to believe, however, that the Massachusetts courts would not effect what seems to us the clear intent of the legislature by applying the protections of section 16C to any building primarily used as a place of assembly by a bona fide religious group. It is a familiar canon that statutes be construed so as to preserve their constitutionality. The extent of the class of "religious institutions" and the like is a possible definitional problem under many statutes found consonant with the first amendment, and has not been seen in the abstract as grounds for invalidation. *See, e. g., Walz v. Tax Commission, supra,* 397 U.S. at 672–73, 90 S.Ct. at 1413; *Zorach v. Clauson, supra,* 343 U.S. at 308 n.1, 72 S.Ct. at 681 n.1. No problem of definition arises in this case—Holy Cross's status as a

---

**8.** Grendel's seems to single out libraries and hospitals as institutions that might benefit from section 16C's protection. (License applicants are currently required, under section 15A, to notify hospitals within 500 feet of the prospective licensed establishment both of the pending license application and of "the necessity of a written objection to prevent the issuance or transfer of such license...." While the objection of a hospital is not given conclusive effect under section 16C, as are those of churches and schools, we take the inclusion of hospitals within the notice provision to be some indication that a hospital's objection is to be given especially serious consideration by licensing authorities.) There are numerous conceivable distinctions that could be drawn between churches and schools on the one hand and hospitals and libraries on the other. Libraries often keep limited hours that may not coincide with those of liquor-serving establishments; moreover, libraries are commonly controlled by the same municipalities that make initial licensing decisions, and thus may be better situated than churches to ward off the licensing of potentially troublesome establishments. Likewise, hospitals, often politically powerful institutions within their communities, might be thought able to wield sufficient influence with local licensing boards so as to render their interests protected by notice of pending applications under section 15A. One might rationally decide simply that the service of liquor is less compatible with the operations of churches and schools than with those of hospitals and libraries; lines must be drawn somewhere. The point is that it is the legislature's function, not ours, to make such distinctions. So long as the "benefits" conferred on churches are not such as to have a primary effect of advancing religion, it does not matter that churches are among a "narrow class of beneficiaries" under section 16C.

"church" is conceded, and neither Grendel's nor the district court has advanced the proposition which worries the dissent that the statute is invalid as favoring some religions over others. In such circumstances, we think it inappropriate to postulate the hypothetical exclusion from section 16C of "groups regularly meeting to discuss situational ethics" as a dispositive factor in the decision.

Once it is decided that a total ban on liquor-serving establishments within the vicinity of a church does not contravene the establishment clause, it is difficult to understand how a provision that, in essence, allows a church to "waive" this protection presents further, and insurmountable, first amendment problems. We have already held that the church's right to object or not object to licensing within the prescribed area is not an improper delegation of "governmental power." Thus we cannot accept Grendel's rhetoric that "section 16C directly invests a church with governmental power, in essence converting each local church into an arm of the state." Nor do we agree that

"section 16C forces each affected church to take a public position with regard to a matter of governmental policy." We find that the Commonwealth has established "governmental policy" with regard to liquor licensing; a church simply stands in the position of a private entity entitled to claim or waive a "zone of protection" provided for its benefit.[9]

We also reject the district court's conclusion that the section violates the establishment clause because it confers on churches the "opportunity to realize economic advantage and exercise political power." The court reached this conclusion by hypothesizing that "a church under § 16C could lawfully exercise its political power to veto license applications for purely religious reasons"[10] and could also "exercise its veto power solely for its economic benefit by tying that decision, directly or indirectly, to the presence or absence of a donation by the applicant." 495 F.Supp. at 767. It was "no answer to suggest that most churches would not abuse the power granted them

9. Churches are not given carte blanche to decide who their neighbors will be, nor are they given power to "veto" licensing within an excessively broad radius such as five miles. They are simply provided protection within a reasonable area from a controversial and highly regulated use—protection that can be dispensed with when unnecessary. We note, moreover, that a church's lack of objection to a pending license application does not give the applicant an automatic entitlement to a license; the local licensing board retains the authority to deny the license for various reasons. *See Arno, supra,* 377 Mass. at 88 n.10, 384 N.E.2d at 1227 n.10 (1979).

10. The possibility that similar decisions could be made for such invidious reasons inheres in any scheme under which private entities are entitled to waive a protection provided by statute. This is a relevant consideration in evaluating the scheme under the due process clause, and one that we have taken into account. Having already decided, however, that the Massachusetts licensing procedure does not offend due process, we do not think that the slight, hypothetical possibility of discrimination along religious (as well as racial and ethnic) lines suffices to create an independent issue under the establishment clause. The district court postulated that "to take an extreme example, a Protestant church could exercise its veto solely to exclude non-Protestant applicants from ob-

taining liquor licenses within 500 feet of that church." It might just as easily have been said in *Cusack, supra,* that a predominantly Protestant neighborhood could have decided to approve the construction of billboards only on behalf of Protestant-controlled corporations. Religious discrimination is not something practiced uniquely by churches; in fact, a charitable observer might even conclude that, at least in the present context, a church is less likely than other private entities to engage in discrimination. In any event, we have difficulty concluding that the mere opportunity to exclude owners of a particular religious denomination from operating liquor-serving establishments within a limited radius has a primary effect of advancing religion. (The parties dispute whether an applicant who could demonstrate that a church had entered its objection for discriminatory purposes would be able to obtain consideration and relief from the MABCC. It seems reasonable to suppose that this or some other avenue of relief would be open to a license applicant who could make such a showing. Since, however, we do not consider this fact determinative to the issue of the statute's facial constitutionality, we need not presently inquire to what extent a church's discriminatory or corrupt misuse of its "veto power" might give rise to remedies under state or federal law.)

under § 16C. The critical fact is that § 16C provides the potential for such abuse." *Id.*

We have serious problems with this approach. First, we think a state legislature is entitled to predicate regulation such as section 16C on the rational notion that churches and schools will act in good faith when exercising objections, without risking invalidation of the regulation because of a vague and unsubstantiated "potential for abuse." *Cf. Tilton v. Richardson,* 403 U.S. 672, 679, 91 S.Ct. 2091, 2096, 29 L.Ed.2d 790 (1971) ("A possibility always exists . . . that the legitimate objectives of any law or legislative program may be subverted by conscious design or lax enforcement."). The proposition that churches will seize upon the flexibility in the Massachusetts licensing scheme to extort donations from license applicants is not only insulting but, to most people, would seem far-fetched as well as without any evidentiary support. Moreover, such extortion is wholly unrelated to either the legislative purpose behind section 16C or the section's "effect," at least so far as that effect can be gleaned from the face of the statute.

We also find inapposite those cases referred to by the district court in which the Supreme Court "has insisted that there be adequate controls ensuring a purely secular purpose before public programs of aid to private schools are upheld." *E.g., Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Levitt v. Committee for Public Education,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973). In all these cases, state funds or services had been provided to religious-affiliated schools or to parents of children enrolled in such schools. Since it is axiomatic that government may not appropriate money for religious ends, a state obviously bears a great burden to ensure that the funds it gives religious institutions are used only for secular purposes. Section

16C, however, does not give monetary or material aid to churches, but simply provides whatever aesthetic and intangible benefits can be derived from a protective liquor-free zone. It seems strained to suggest that the state must provide a policing mechanism to ensure that the right to waive this protection is not converted into cash, at least in the absence of evidence that such abuse occurs with any frequency.[11] Even if some such abuse were shown, we would have difficulty concluding, as the district court did, that *"public* money" was thereby being used for religious purposes.

In sum, we find that section 16C does not "on its face" violate the establishment clause, and on the basis of the record before us no establishment clause violation has been shown.

### III.

We come finally to the question whether plaintiff's antitrust claim is precluded by the so-called "state action exemption" explicated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942) and subsequent cases. We agree with the district court that the exemption does not apply, both because section 16C's alleged "anticompetitive effects" are not "clearly articulated and affirmatively expressed as state policy," and because there is insufficient state involvement in supervising the alleged "restraints of trade." *See California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *see also New Motor Vehicle Board v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). In so holding, we take the gravamen of Grendel's antitrust complaint to be that provision of a *selective* right to object to licensing enables churches to use their

---

11. Of course, since Holy Cross has exercised its objection here, and thus has decided not to waive the protection, there can be no contention that the Church has in this instance "trad-ed in the marketplace for direct economic benefits" whatever "power" it is given under section 16C.

"veto power" on behalf of private persons conspiring to suppress competition,[12] *and* that the Holy Cross Church has interposed its objection for such anticompetitive ends in this instance. There has been no showing that Massachusetts intended section 16C to authorize and effectuate such private conspiracies,[13] and thus the state action doctrine, said to be germane only when "anticompetitive conduct is compelled by direction of the State acting as sovereign," *Goldfarb v. Virginia State Bar*, 421 U.S. at 791, 95 S.Ct. at 2015, does not bar the claim.[14]

This having been said, however, we confess some difficulty imagining how section 16C "on its face" violates the antitrust laws. Grendel's offers the following description of section 16C:

> "Section 16C merely permits, but does not require, any anti-competitive activity. The anti-competitive decision is solely that of the church governing body, reached in possible collusion with various liquor licensees. That the decision becomes effective by virtue of Section 16C does not make the anti-competitive choice one attributable to the state."

If so, one might wonder why the statute is to be declared facially invalid in a suit against state and municipal agencies and officials.

The merits of Grendel's antitrust claim are not before us on this appeal, and we do not decide the issue. However, we do express our doubt, at this point, that a state statute is facially invalid under the Sherman Act merely because it creates some limited (and unused) opportunity for private parties to act anticompetitively.[15]

*The judgment of the district court is reversed and the case remanded for further proceedings not inconsistent with this opinion.*

COFFIN, Chief Judge (dissenting).

The court upholds a state law that confers upon churches (and schools) an absolute veto power over the proposed sale of alcohol within 500 feet. Although I appreciate the minimal span of this baby step, I believe it has managed to cross the threshold of the Establishment Clause.

Because this is a facial challenge, we must read the statute with an eye sensitive to constitutional problems presented by the law's very language. I see several difficulties. First, and, I presently think most important, is the strange delegation of political or governmental power on an explicitly religious basis. Apart from schools, the only entity that can veto a liquor license is "a church or synagogue building dedicated to divine worship and in regular use for this purpose". This formula is an extraordinarily precise definition. The building must be that of a "church" or "synagogue" dedicated to "divine worship". Whether a mosque, marabout, pagoda, or tope would qualify is an open question for the purposed use of

---

**12.** Defendants again argue that the MABCC retains power to correct this sort of abuse, *see* note 10, *supra*.

**13.** Indeed, defendants themselves maintain that "§ 16C does not, under any construction, authorize a church or school to enter into a conspiracy or agreement in restraint of trade with private persons."

**14.** As we understand it, appellee does not seek to argue that provision of a liquor-free zone, in and of itself, runs afoul of the Sherman Act. We think such a claim could not stand. As noted above, Massachusetts has adopted a general policy against liquor-licensing in the vicinity of churches and schools. This sort of state "regulation ... designed to displace unfettered business freedom" in the distribution of alcoholic beverages is, despite possible adverse effects on competition, beyond the scope of the Sherman Act. *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 109–11, 99 S.Ct. 403, 412, 58 L.Ed.2d 361 (1978); *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 133, 98 S.Ct. 2207, 2217, 57 L.Ed.2d 91 (1978).

**15.** Churches are not engaged in competition with liquor-serving establishments and have no institutional reason for suppressing competition in the liquor trade. Thus, this is not a situation where anticompetitive decisionmaking could be deemed peculiarly likely. *Cf. New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) (existing automobile franchisees empowered to require hearing on existence of "good cause" to prohibit entry of prospective franchisees).

the building must be "divine worship". Whether Buddhism, Confucianism, or transcendentalism (of either oriental or New England variety) can be comfortably cabined under such a label may be doubted.

There may well be other important assemblings of the human race whose activities could be described as "worship" but whose object is not "divine"; conversely, there may be those whose objective is "divine" but whose activities fall somewhat short of (or outside of) "worship". Yet in their need for calm and quiet, in their hours of operation, in their political power (or lack of it), they may be identical to the paradigm Christian church or Jewish synagogue. The court's opinion distinguishes between churches and schools on the one hand and hospitals and libraries on the other. These are not the difficult comparisons. To me the problem is seen more clearly if we consider, for instance, groups regularly meeting to discuss agnosticism or situational ethics.

I would not relish the task of identifying the institutions, groups, and ephemeral gatherings that would lie within and without the pale. Such line drawing, I fear, would bring one within the interdiction of preferring one religion over another. More importantly, even if all gatherings of religiously oriented humankind can be harmoniously put under one roof, section 16C would confer on religious organizations a governmental power denied to all others except schools.* While governmental assistance to organized religion is effectuated through tax exemptions for institutions and charitable deductions for their adherents, such measures are also widely applicable to other institutions, organizations and causes. I can think of no area where we restrict the receipt of a governmental benefit or privilege solely to a religious group or institution.

The court's opinion posits the proposition that since a municipality could impose a liquor free zone surrounding any church, it clearly may soften the impact by allowing churches the option of refraining from vetoing license applications. Whether or not the first part of this proposition is true, the second part does not follow. Although our law gives conscientious objectors the privilege of refusing military service, a law that allowed religious institutions to determine who qualified as conscientious objectors would surely be invalid.

Even if the delegation of power to religious bodies to dispense governmental privilege were permissible, section 16C suffers the particular defect of permitting absolutely standardless exercise of this power. *Arno v. Alcoholic Beverage Control Commission,* 377 Mass. 83, 90, 92, 384 N.E.2d 1223, 1228, 1229 (1979) (scrutiny of church objection limited "to such questions as whether the objecting institution qualifies as a 'church' for the purposes of the statute, whether it is within the statutorily protected zone of 500 feet, and whether the written objection was duly authorized by the appropriate 'governing body' of the church").

The possession of unbridled discretion is a power we do not give even to popularly elected officials. It is no denigration of religious organizations to acknowledge that, being constituted of fallible human beings, their exercise of uncontrolled discretion may on occasion be less than high minded or, if high minded, wrongly directed. But what troubles me more deeply than easily conjectured examples of arbitrariness is the simple fact that section 16C grants an unrestricted power to deny liquor licenses, a power that can be used to serve sectarian purposes, to churches but not to other similarly situated organizations. So to characterize this case is, for me, to decide it. Laws may not have more than a "remote and incidental" effect in the advancement of religion. *·Committee for Public Education v. Nyquist,* 413 U.S. 756, 784 n.39, 93 S.Ct. 2955, 2971 n.39, 37 L.Ed.2d 948 (1973). I believe that a statute that invites churches into the neighborhood political arena by granting them discretionary veto

---

* Cf. *Rhode Island Federation of Teachers v. Norberg,* 630 F.2d 855, 861 (1st Cir. 1980) (extent

to which affected class is sectarian is a "pivotal factor in determining . . . constitutionality").

powers over commercially significant activity based on their religious status must have more than such an effect.